**NATIONAL MARINE SERVICE, INC.,**
**Plaintiff-Appellee,**

v.

**C. J. THIBODEAUX AND COMPANY, Individually and as partner of the Prairie Co., D. J. Glenney, III and J. Franklin Morris, Defendants-Appellants.**

No. 73-3584.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1974.

L. Glen Kratochvil, T. G. Schirmeyer, Houston, Tex., for defendants-appellants.

Larry D. Knippa, Houston, Tex., for plaintiff-appellee.

Before MOORE,\* AINSWORTH and RONEY, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of Texas, Houston Division, by Hon. Woodrow B. Seals, *District Judge,* finding for the plaintiff-appellee, National Marine Service, Inc., in the amount of $18,683.76 plus interest, that sum representing the fair value of repairs performed by National Marine Service, Inc., upon the vessel GRAND LAKE owned by defendants-appellants. The theory of recovery advanced by the District Court and disputed by appellants was that, although the GRAND LAKE was nominally chartered to River Gulf Corporation (hereafter "River Gulf"), a corporate entity allegedly separate from appellants, appellants in fact ordered the repairs, the charterer being a mere corporate shell created by appellants. Looking beyond the corporate form and finding that the repairs were, in reality, ordered and performed for the benefit of appellants, the court required them to pay the fair cost in order to prevent a substantial injustice.

We affirm.

National Marine Service, Inc. (hereafter sometimes referred to as "Shipyard"), is a Delaware corporation having its principal place of business in St. Louis, Missouri, and with a portion of its operations, a shipyard, in Illinois. The three defendants-appellants are a corporation, C. J. Thibodeaux and Company (hereinafter "Thibodeaux"), individually and as a partner of The Prairie Company, and two individuals, D. J. Glenney III and J. Franklin Morris, also partners of The Prairie Company.

Thibodeaux wished to expand its business by starting a ship owning and operating subsidiary. However, it hesitated to do so openly since such an operation would have been in competition with Thibodeaux's ordinary customers. Therefore, The Prairie Company was incorporated to shield the parent company and act as its ship owning instrumentality. As part of The Prairie Company's operations, the GRAND LAKE, a tug boat, was purchased. Eventually, and prior to the events relevant to this case, The Prairie Company was dissolved as a corporation but, at all times relevant to this case, its activities were continued and its name assumed by a partnership (hereafter "Prairie"), of which the three appellants are partners.

The GRAND LAKE was chartered, along with four barges also owned by appellants, to Coastal Barge Lines. However, in January, 1969, when Coastal failed to pay the charter hire, Prairie reclaimed the vessels. Thus, at that time, Thibodeaux and its partners were faced with the task of finding new employment for these assets.

Somewhat prior to this time, an employee of Thibodeaux, one Fred Thompson, had formed a corporation, River Gulf, with the intention of eventually using it to manage marine freight operations. However, for some time River Gulf was left uncapitalized and inactive. At the same time, when appellants found themselves forced to reclaim the GRAND LAKE and the barges from Coastal Barge Line, Thompson capital-

\* Hon. Leonard P. Moore, Senior Circuit Judge for the Second Circuit, sitting by designation.

ized River Gulf at the minimum $1,000 required by Texas law, and offered River Gulf to James H. Chadwick, Jr., the president of Thibodeaux, as a potential medium for the operation of the GRAND LAKE.

This was agreed to, and the vessel and the barges were turned over to River Gulf. As part of the agreement, Thompson, who managed River Gulf from Thibodeaux's offices, hired one Mark Shurden, a long-time acquaintance of the president of Thibodeaux, to run the GRAND LAKE as an independent contractor. A six-months bareboat charter was prepared between The Prairie Company, the owner of the GRAND LAKE and River Gulf, requiring a monthly prepayment of the charter hire of $50 per day. This charter, however, was never signed by River Gulf. However, it was claimed that there was an oral agreement to this effect which, upon the expiration of the six months, was continued in force. According to the terms of the charter River Gulf and its operatives were not empowered to incur liens against the vessel except for crew's wages and salvage, and a notice to this effect was posted in the wheelhouse of the GRAND LAKE.

In December, 1969, the GRAND LAKE put into the Shipyard and repairs on her crankshaft were ordered by Mark Shurden. These repairs were completed in February, 1970. One hundred days thereafter, Shipyard, still being unpaid, contacted Thompson the president of River Gulf. Thompson stated that he was expecting insurance payments in connection with the GRAND LAKE and asked Shipyard to write a letter concerning the repairs performed to the insurance carrier. After such a letter proved to be without effect, Shipyard on November 3, 1970, instituted a Texas state court suit against River Gulf. However, by this time a series of reverses had left River Gulf financially defunct and the default judgment eventually entered proved to be worthless. On February 17, 1971, Shipyard brought a libel against the vessel itself, but that action too was fruitless as the GRAND LAKE

had burned and sunk the year before. Both of these actions were brought before Shipyard learned of the relationship between Prairie and River Gulf. However, upon discovering the connection, the present action was brought against the Prairie partnership on the twin bases of 28 U.S.C. § 1332 (diversity) and 28 U.S.C. § 1333 (admiralty), and it is from the decision of the District Court in favor of plaintiff, National Marine, that this appeal is taken.

In its opinion, the district court addressed itself primarily to the relationship between Prairie and River Gulf and concluded "that River Gulf was a mere alter ego of Prairie Company; that the bareboat charter was a fiction; and that the repairs were performed for the benefit of Prairie Company with its actual and constructive knowledge."

■ Our appellate function is limited to an examination of the record to ascertain whether these conclusions rest on a solid factual foundation. We find that they do and that the court's appraisal of the credibility of the key witnesses before it was more than justified.

■ Appellants contend that any finding of liability against them as an "alter ego" of River Gulf requires a showing of fraud on their part. Such fraud concededly not being present in this case, it is argued that the decision of the district court must be reversed and the action against them dismissed. However, this assertion does not represent the applicable law. Although there is no doubt that fraud is a proper matter of concern in suits to disregard corporate fictions, it is not a prerequisite to such a result, especially where there is gross undercapitalization or complete domination of the corporate entity under scrutiny. Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669 (1939); 2 G. Hornstein, Corporation Law and Practice § 756 (1959); see generally W. Cary, Corporations, 109–112, 128–143 (4th ed. 1969).

The district court found that:

While never intended to be such River Gulf became an operating arm of Prairie Company and C. J. Thibodeaux and Company. Upon these facts, it appears to this Court that River Gulf was a mere alter ego of Prairie Company; that the bareboat charter was a fiction; and that the repairs were performed for the benefit of Prairie Company with its actual or constructive knowledge.

The corporate veil, with which appellants would enrobe River Gulf to give it the semblance of being attired in corporate clothing, was so diaphanous that the district court was well able to see through it. Thus, its conclusions of liability were properly drawn.

 Another argument raised by appellants is based on section 973 of the Merchant Marine Act, 46 U.S.C. § 973 (1970). That section prevents the creation of a shipyard's lien against a vessel for repairs or supplies where the shipyard could reasonably have ascertained that the person ordering the repairs or supplies lacked the authority to bind the vessel. The gist of this contention is that Shipyard should have discovered the relationship between River Gulf and Prairie before starting on the repairs and presently should not be allowed to recover their cost because they were not authorized by the owner. The district court found that although this omission might have prevented the creation of lien against the vessel, it did not affect any *in personam* rights the Shipyard acquired. With this conclusion we agree.

There remains appellants' argument that the state court proceedings resulting in a judgment against River Gulf (uncollectible though it be) precluded the bringing of this action. The district court disposed of this argument upon the facts stating: "There is nothing in the record to indicate that National Marine was even remotely aware of what had transpired between River Gulf and Prairie Company until after an attempt had been made to collect the judgment against River Gulf." Once

this discovery was made, Shipyard was entitled to institute this action upon the theory that the recovery is based upon "a contract for the repair of a vessel." Principles of equity were also called upon "to prevent a substantial injustice" because "The vessel owner [Prairie] was the real beneficiary of the Plaintiff's acts." (District Court's opinion).

The judgment of the District Court is affirmed.