**EDWARDS COMPANY, INC.,
Plaintiff-Appellant,**

v.

**MONOGRAM INDUSTRIES, INC., Monotronics, Inc. and Entronic Company,
Defendants-Appellees.**

**No. 82–2019.**

United States Court of Appeals,
Fifth Circuit.

Sept. 1, 1983.

Larry D. Knippa, Houston, Tex., for plaintiff-appellant.

Dan Matthews, Houston, Tex., for Monogram Industries, Inc.

Charles L. Babcock, Dallas, Tex., for amicus curiae, Nat. Realty Committee, Inc.

## ON PETITION FOR REHEARING

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Petition for Rehearing is DENIED.

In its Suggestion for Rehearing, the defendant-appellee Monogram asserts, gloomdoomily, that in addition to being an incorrect application of Texas law, the panel opinion signals a major body blow to present and future corporate investment throughout the United States.

Addressing the latter issue first, we note that the opinion is limited to Texas. It has no application outside of Texas, not to the other states within the Fifth Circuit, not to other states outside the Fifth Circuit.

Additionally, the decision in this case has been carefully and deliberately restricted to its facts. This is an individual case decided according to the totality of its individual facts, under Texas cases which are less than consistent and which provide no "bright-line" demarcation as to when a subsidiary corporation will be pierced. Our opinion does not attempt to decide policy or to plot a course for Texas corporate law. That job, it seems to us, is for the Texas courts. Rather, our opinion attempts to apply the facts of the instant case to the rules of law gleaned from Texas cases. If, as suggested by the petitions and briefs before us, many Texas corporations have acted on the basis that under no circumstances can the corporate veil be pierced unless evidence of fraud or similar wrong is adduced, then, in our opinion, those corporations have failed to observe the cases under each of the lights to which they may be subjected.

The facts set forth in the panel opinion constitute sufficient compelling factors, as required by Texas law, to require piercing Monotronics's veil. Monotronics was, in all senses, a sham corporation. And while this might not constitute fraud *per se,* it does constitute an additional *equitable* basis for disregarding Monotronics's existence and for holding Monogram liable for the debts incurred in Monotronics's name. As discussed in *National Marine Service, Inc. v. C.J. Thibodeaux and Co.,* 501 F.2d 940, 942 (5th Cir.1974), and *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098, 1106–07 (5th Cir.), modified factually, 490 F.2d 916 (5th Cir.1973), where the parent corporation is the party which in fact creates the obligation, the parent should be held liable. Monogram ran Entronic as its de facto general partner; Entronic's gains were Monogram's gains, and Entronic's losses were Monogram's (tax) losses. Monotronics had nothing to do with it. Monogram, through Entronics, created the debts owed Edwards; it cannot now evade those debts by holding up the sheer specter of Monotronics.

Because the principal case cited by Monogram in its petition is *Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336 (Tex.1968) (cited 700 F.2d at 1003), we primarily address that case here. In *Bell,* Allied, which had dealt with Bell's subsidiaries, sought recovery from Bell based on the corporate relationship between Bell and three of its affiliated corporations. The suit was "based upon contractual obligations and not upon fraud or some other tort." 431 S.W.2d at 338. The trial court and the Court of Civil Appeals had found that Bell and its co-parent corporation, Lubell, were liable for their subsidiaries' debts because they had " ' "so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make those companies a mere agent,

representative, adjunct, device, stooge or dummy"'" of Bell. 431 S.W.2d at 336 (quoting court of appeals' quote of trial court).

In commenting on this finding by the lower courts, the Texas Supreme Court in *Bell* states:

> While the language of the trial court's finding contains a number of harsh sounding nouns following the word "agent," they add nothing to the proposition embraced in the finding because of the absence of a finding of fraud. *The question presented is, were Mid-Tex and Apollo, despite their corporate forms, mere agents of Bell?*

*Id.* (Emphasis added.)

The *Bell* court then goes on to cite numerous authorities, in Texas and elsewhere, concerning the necessary separate identity of parent and subsidiary corporations. In distilling these authorities, *Bell* states that, in order for there to be a finding of liability on the part of the parent for the debts of the subsidiary:

> [i]t seems reasonably certain . . . that the corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangements, *or* one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, *of which the corporate arrangement is a part.*

*Id.* at 340 (emphasis added). The court then states that the basic rule is that:

> " 'Courts will not disregard the corporate fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate

a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.' "

*Id.,* quoting *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 202 (Tex.1962), quoting *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 351 (1955).

After dismissing out of hand any question of fraudulent incorporation of the subsidiaries, *Bell* analyzes at length the day-to-day business operations of the affiliated corporations, finding that "[t]he separate corporate entity of the three Lubell-Rothstein corporations was maintained." *Id.* at 341. Then, *in conclusion,* the court summarily states that "[t]he trial court has apparently held that Mid-Tex and Apollo were the agents of Bell and had no corporate identity independent of Bell. We disagree with this conclusion." *Id.*

*Bell* stands as a perfect example of the "somewhat confusing" case law in Texas. 700 F.2d at 999. Like a good Christmas pie, there is something there for everyone. In the final analysis, however, viewing all the bits and pieces of language in the context of the case, *Bell* supports the decision in the instant case that where, as here, the subsidiary is but a sham,[1] serving the sole purpose of avoiding liability, Texas law will not give it legal effect. If *Bell* did not intend this, the court would have concluded its opinion after determining there was no fraudulent, illegal or improper purpose in the incorporation or operations of the subsidiaries. The entire factual inquiry in *Bell,* however, is aimed at raveling the inner workings of the relationship between Bell and its subsidiaries. Upon concluding that inquiry, the court found that the subsidiaries did have existence separate and apart from the parent and that they were not mere agents of the parent. *The case turned on this point, and the lower courts were reversed on this point.*

The inter-corporate relationship between Bell and its subsidiaries is set forth in detail

---

1. We emphasize again that the sham was *not* Entronic, the partnership, but Monotronics, the corporation. Entronic was a viable entity. Had Monogram allowed Entronic to continue as a corporation, Edwards would certainly not have been able to go beyond Entronic to recover its debts.

in the Texas Court of Civil Appeals' opinion at 420 S.W.2d 779, 780–82 (Tex.Civ.App. 1967). While there were instances of agency and domination, suffice it to say that Bell's subsidiaries, unlike Monotronics, were real and had substance. The *Bell* case and the instant case are, in our view, entirely consistent.

▆ Perhaps one of the most revealing portions of the *Bell* decision is its equation of "mere agency" with "fraud." When the court states that all of the "harsh sounding nouns" elaborating on "mere agency" do not contribute to the finding, "because of the absence of a finding of fraud," it goes on to state that "[t]he question presented is, were Mid-Tex and Apollo, despite their corporate forms, mere agents of Bell?" *Id.* at 339. In our view, this indicates that where a parent corporation creates a sham subsidiary corporation which exists only on paper and attempts to erect that corporation between it and its creditors, Texas courts will not give cognizance or effect to the subsidiary.

▆ To summarize briefly, the facts established *in toto* in this case showed that:

1. Monotronics was wholly owned by Monogram.

2. All of the officers and directors of Monotronics were either officers or directors of Monogram.

3. Monotronics, although the "general partner" of Entronic Company, never exercised any control over Entronic.

4. Monotronics did not have any employees, pay any salaries or direct any production or sales policies or participate in such.

5. Monotronics had no telephone or office space.

6. Monogram paid for all expenses attributable to Monotronics such as stationery, patent search fees and filing fees.

7. Monogram performed all of Monotronics's bookkeeping and combined all of Monotronics's tax returns with its own.

8. Monogram obtained all credit and performed all financing for Monotronics/Entronic.

9. Just as Monotronics did not participate in the routine decisions regarding Entronic's affairs, neither did it participate with respect to the major decisions of Entronic's very life. For example, Monotronics exercised no control over the relocation of Entronic Company's plant from Missouri to Texas or over the doubling of the size of the plant. No minutes were recorded in Monotronics's records about these matters or about the firing of Entronic's president, Al Hayes.

10. Monotronics was, on occasion, not only a mere conduit for Monogram, but was completely ignored. For example, without any authorization or ratification from Monotronics, Monogram poured over $484,000 into Entronic between July and October 1977. At that point, Monotronics formally "authorized" such "borrowing" of money from Monogram. These "loans" were never repaid.

11. The $251,000 "capital" infused initially into Monotronics was never used except by Monogram for credit purposes or, when the venture was in extremis, to bankroll an attempted release of general unsecured creditors. This attempted release was subsequently nullified in bankruptcy court. None of the "capital" went to Entronic's creditors.

In short, Monotronics had no mind of its own, no body of its own, no will of its own, and, indeed, no existence of its own. Everything it was, everything it did, everything it decided, everything it succeeded in, everything it failed in, everything it aspired to, every disappointment it suffered was the being, act, decision, success, failure, aspiration and disappointment, alas, of Monogram, and not that of the piece of paper known as Monotronics. Time and time again, we see Monogram manipulating the Entronic finances and operation without the slightest regard for Monotronics's existence. Because, as Monogram well knew, Monotronics had no existence except as a piece of paper. And now, after almost completely disregarding Monotronics's existence, Monogram asks us to recognize it as a

viable entity. Texas law does not permit that, however.

 Monogram states in its petition that the conclusion that Monotronics was a sham was based essentially on the fact that Monotronics existed solely as general partner in the limited partnership. *If that is the inference created by the opinion, then we hereby dispel that inference.* The conclusion that Monotronics was a fictitious "fictitious entity" was based on the sum of *all* the facts set forth in the opinion. That sum equaled zero—there was no viable, acting, separate Monotronics. The fiscal transactions, the physical realities, all demanded this conclusion. Certainly a subsidiary corporation acting as a general partner in a limited partnership can shield the parent—if the subsidiary exists in more than name only.

This is a close case insofar as the appropriate legal standard is concerned. The Texas cases on point are, as discussed, confusing. The facts, however, are not close.

The appellee's petition for rehearing is, therefore,

DENIED.