### III.

Alvin B. Rubin, Circuit Judge, filed concurring opinion, in which Tate and Higginbotham, Circuit Judges, joined.

E. Grady Jolly, Circuit Judge, filed dissenting opinion, in which Johnson and Williams, Circuit Judges, joined.

**EDWARDS COMPANY, INC.,**
**Plaintiff-Appellant,**

**v.**

**MONOGRAM INDUSTRIES, INC., Monotronics, Inc. and Entronic Company, Defendants-Appellees.**

No. 82–2019.

United States Court of Appeals, Fifth Circuit.

April 23, 1984.

Larry D. Knippa, Houston, Tex., for plaintiff-appellant.

Dan Matthews, San Antonio, Tex., for Monogram Industries, Inc.

Charles L. Babcock, Dallas, Tex., for amicus-National Realty Committee, Inc.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

This case involves an attempt by Edwards Company, Inc.[1] to pierce the corporate veil of Monotronics, Inc. in order to hold its parent corporation, Monogram, Inc.,[2] liable for $352,000 in debt of Monotronics owed to Edwards.[3]

After a bench trial, the district court, applying Texas law in this diversity case, refused to pierce Monotronics' veil. It held that "[Edwards] has failed to show that Monotronics was incorporated for an illegal, fraudulent, or improper purpose, that Monogram employed inequitable means to place [Edwards] in a position of disadvantage, or that [Edwards] acted to its detriment as a result of representations made by Monogram." Record Vol. III at 760.[4]

1. Edwards is a New York corporation with principal offices in Connecticut. Edwards is one of over twenty subsidiaries of General Signal Corporation.

2. Monogram is a Delaware corporation with principal offices in California. Monogram is a conglomerate with six or seven subsidiaries. Its primary business is the manufacture and sale of electrical and metal products.

3. Monotronics did not participate in the full trial. An interlocutory judgment was taken against Monotronics at the outset of the trial and was included in the final judgment. By the time of trial, Monotronics had assets of only $10,000.

4. The relevant findings of fact upon which the district court's ultimate conclusions of law were based are as follows:

* * * * *

4. At all material times, Monotronics had its own officers and Board of Directors.

5. At all material times, corporate formalities such as election of officers and directors and recording of actions of directors and shareholders and duly kept minutes were observed by Monotronics.

6. Intercorporate transactions between Monogram and Monotronics were recorded on the books and records of each company.

7. Through its stock ownership, Monogram controlled the affairs of Monotronics to a degree.

8. Monotronics was not formed for any fraudulent or illegal purpose, or to promote or perpetrate an injustice.

9. Monogram did not manipulate the affairs of Monotronics or Entronic Co. to its own special benefit and to the detriment of Edwards Company, Inc. so as to amount to fraud or grave injustice to Edwards.

10. Edwards Company, Inc. did not act to its detriment as a result of representations made by Monogram.

* * * * *

Record Vol. III at 758–59.

A panel of this court reversed, 700 F.2d 994 (5th Cir.1983), holding that where a "subsidiary has no real corporate existence but serves as a mere conduit for the parent, Texas law permits a creditor to go against the parent for debts incurred," *id.* at 995, notwithstanding the fact that the creditor has made no showing of fraud or injustice. We granted en banc rehearing, 715 F.2d 157 (5th Cir.1983), primarily to decide whether, under Texas law,[5] a plaintiff suing on a contract must show fraud or injustice before piercing the corporate veil, and secondarily to determine whether the panel correctly characterized Monotronics as having "no existence of its own." 713 F.2d 139, 142 (5th Cir.1983).[6]

Contrary to the panel, we agree with the district court that in order to pierce the corporate veil on a contract claim in Texas, a showing of fraud or injustice is required and that no such showing was made here. Although not necessary to our result, we also conclude that the district court's findings of fact, which are not clearly erroneous, and the full record in this case do not support the panel's conclusion that Monotronics had no existence separate from that of Monogram. We therefore affirm the judgment of the district court.

## I.  FACTUAL BACKGROUND.

The facts of this case have been fully described in the panel opinion, and can be summarized here as follows: In 1977, Monogram decided to acquire Entronic Corporation, a corporation located in Earth City, Missouri that produced and sold smoke detectors. Entronic was a profitable business, with a sales volume of $9,000,000 in 1976, pre-tax earnings that reached $1,000,- 000 by June 30, 1977, and a net worth at June 30, 1977, of approximately $900,000.

Entronic was considered an especially attractive acquisition because it had strong sales in the "captured market," *i.e.*, among customers who were required by law to install smoke detectors.

Monogram decided to effect its purchase of Entronic through Monotronics, a wholly-owned subsidiary created in May 1977.[7] Monogram's contribution to the capital of Monotronics at formation was approximately $1,800,000 in cash. In July 1977, Monotronics bought seventy-five percent of Entronic's stock pro rata from its shareholders. Then Monotronics and these shareholders formed Entronic Company, a limited partnership organized under the laws of the State of Missouri. Monotronics constituted the sole general partner, with a seventy-five percent interest in the partnership's profits and losses, and the other shareholders in Entronic Corporation were limited partners with a total interest of twenty-five percent. Both Monotronics and the limited partners contributed their Entronic stock to the partnership and Entronic Corporation was subsequently liquidated.

Monotronics was operated out of Monogram's offices in Santa Monica, California. All of the officers and directors of Monotronics were either officers or directors of Monogram. Monotronics did not have its own payroll, telephone or office space, and all of Monotronics' bookkeeping was handled by Monogram. Entronic's employees scheduled production, ordered supplies and marketed Entronic's smoke alarms. Entronic's financing, which was required primarily for working capital and for a plant expansion in Texas, was accomplished through unsecured loans provided by or guaranteed by Monogram.

**5.** Both parties have briefed and argued this case to the district court and this court on the theory that Texas law applies. We therefore decide the case under Texas substantive law without expressing any opinion as to whether the assumption that Texas substantive law should be applied is correct.

**6.** The panel denied Monogram's petition for rehearing, 713 F.2d 139 (5th Cir.1983), and, in so doing, discussed further the reasons for its holding. Thus, we address both the panel's opinion and its denial of rehearing, and cite the two throughout our opinion.

**7.** Monotronics was formed as a Missouri corporation and is licensed to do business in Missouri and Texas.

Entronic's business remained strong for several months: Immediately following the acquisition, one month's sales were approximately $1,800,000 and in March 1978 sales were $1,600,000. In April, however, sales fell to $1,000,000 and in May sales had fallen to $340,000, with losses of $187,000. This decline in profits is attributed to several factors: General Electric's "dumping" alarms on the market at greatly reduced prices; poor quality control and a high rate of smoke alarms returned to the plant; and difficulties in collecting accounts receivable.

Although several attempts were made to rescue Entronic, sales continued to drop and losses mounted. In February 1979, Monotronics sold its interest in Entronic to Newco W.A.H., a corporation headed by the former president of Entronic, Al Hayes. Soon after that, Newco filed a Chapter 11 bankruptcy petition in the Southern District of Texas. At the time of the trial, Monotronics was not conducting any business and had total assets of approximately $10,000.

Entronic's largest outstanding creditor was Edwards. Edwards manufactures the "midi-horns" that sound the alarm in smoke detectors. Edwards first sold midi-horns to Entronic Corporation in late 1976. Before Entronic was allowed to buy these horns on credit, Edwards performed an extensive credit check on Entronic, obtaining information not only from Entronic's bank but also from some of Entronic's creditors.

More midi-horns were sold to then-Entronic Company in the fall of 1977 and Edwards experienced difficulty in getting paid. Eventually, after putting a credit hold on Entronic, Edwards was paid. It then sold Entronic $352,247.68-worth of midi-horns from March 23, 1978 to June 30,

1978. Payment was not made by Entronic on this extended credit, resulting in liability of the general partner Monotronics for the debt, and this suit was then brought.

Edwards was not misled into extending any credit because of any misrepresentation made by Monogram. As the panel noted:

Edwards did not learn of Monogram's July 1977 acquisition until December 1977, after Edwards had experienced credit problems with Entronic in the fall of 1977. It did not learn of Monotronics' existence until the following September, over one month after the last shipment to Entronic. The shipments made in the spring and summer of 1978 were made without knowledge of Monotronics' existence, but they also were made without any assurance or representation from Monogram that it would stand for Entronic's debts.

700 F.2d at 999.[8]

## II. THE NECESSITY OF SHOWING "FRAUD OR INJUSTICE."

We note at the outset that Edwards seeks to hold Monogram liable for a contractual obligation as opposed to a tort claim. In *First National Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100 (1939), the Texas Supreme Court set forth the showing a plaintiff must make in order to pierce the corporate veil when suing on a contract. In *Gamble*, the plaintiff sued a subsidiary to collect on a promissory note. The court held the parent company liable for the subsidiary's debt because the two corporations had no separate identities and because the officers of the parent had breached a relationship of trust between the parties in interest. The court noted that the corporate fiction could not be disregarded unless "the separate-

8. At trial, Brian Sickler, chief financial officer of Edwards, testified that Edwards relied solely upon its own appraisal of Entronic's financial strength before extending credit, and that a customer's previous payment record had to be sufficient to justify future shipments on credit. Record Vol. V at 226–27. Sickler also testified that Edwards learned of Monogram's involvement in Entronic through a December 9, 1977 Dun & Bradstreet report that erroneously stated that "Effective June 30, 1977, Monogram acquired a seventy-five percent interest in Entronic Corporation...." *Id.* at 209. A later Dun & Bradstreet report dated September 22, 1978, correctly stated that Entronic Corporation had been acquired not by Monogram, but by Monotronics, one of Monogram's subsidiaries.

ness of the corporation has ceased *and* 'the facts are such that an adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or promote injustice.' " 132 S.W.2d at 103 (quoting *Minifie v. Rowley*, 187 Cal. 481, 202 P. 673 (1921)) (emphasis added).

That a showing of fraud or injustice must be made by creditors was reaffirmed by the Texas Supreme Court when it discussed the different requirements for piercing the corporate veil in contract and tort cases in *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336 (Tex. 1968), and *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571 (Tex.1975). In *Bell*, Allied Chemical Corporation sought recovery from Bell Oil & Gas Company for the debts incurred by an affiliated corporation, Mid-Tex Development Company, and a subsidiary corporation, Apollo Oil Company. The suit was "based upon contractual obligations and not upon fraud or some other tort." 431 S.W.2d at 338. The trial court and the court of civil appeals had found that Bell and its co-parent corporation, Lubell & Company, were liable for their subsidiaries' debts because they had " 'so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make those companies a mere agent, representative, adjunct, device, stooge or dummy' " of Bell. *Id.* at 339 (quoting court of civil appeals' quote of trial court). In reversing, the Texas Supreme Court held that, in a contract case, the corporate form is not to be disregarded unless the corporate entity is being " 'used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.' " *Id.* (quoting *State v. Swift & Co.*, 187 S.W.2d 127, 131–32) (Tex.Civ.App.—Austin 1945, writ ref'd) (citations omitted).

In distinguishing contract claims from tort claims, the court noted that:

"The attempt to hold a parent corporation where the claim asserted is of contractual origin presents added difficulties. The very reasonable question must be met and answered why one who contracted with the subsidiary and received the promise which he bargained for but who has been disappointed in the fulfillment by the subsidiary of its commitment should be allowed to look to the parent. As a matter of contract right it is evident he may not. Additional compelling facts must appear."

431 S.W.2d at 339–40 (quoting Douglas & Shanks, *Insulation From Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 210 (1929)). The court recognized that delineation of these "additional compelling facts" in the form of a general rule is difficult, but concluded that "the corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with [it], or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part." 431 S.W.2d at 340. The court then proceeded to determine whether Bell had used Mid-Tex and Apollo to perpetrate fraud or injustice. The court found that there was "no evidence that Mid-Tex was originally incorporated for an illegal, improper or fraudulent purpose," *id.*, and that Apollo was organized to succeed Mid-Tex. The court also found that no credit was advanced by Allied to either Mid-Tex or Apollo "because of any representation, statements or guarantees made by Bell." *Id.* at 341. Finally, the court found that each of the corporations had been maintained as a separate corporate entity and that during the time that Allied had sold petroleum products to Mid-Tex and Apollo, Bell received no payments or credits from Mid-Tex on indebtedness to Bell. *Id.* Thus, the court held that since Bell had not engaged in any fraud or injustice, Allied could look only to Mid-Tex or Apollo for payment.[9]

A different result was obtained in *Gentry v. Credit Plan Corp.*, where the plain-

---

**9.** In denying Edward's petition for rehearing, the panel asserted that *Bell* indicates that where

tiffs brought a tort claim against a parent corporation for the acts of its subsidiary. In distinguishing tort claims from contract actions, the court observed that:

Unlike a suit for breach of contract, the plaintiff in a tort case does not have the burden of justifying a recovery against the parent when he willingly contracted with the subsidiary. The problem in such a case is essentially one of allocating the loss. It is not necessary to establish fraud, and the financial strength or weaknesses of the subsidiary is an important consideration.

528 S.W.2d at 573 (citing *Bell*).

In *Gentry*, the court found that the subsidiary Credit Plan was not operated and used by the parent Colonial as a separate entity and that the subsidiary was undercapitalized. Thus, the plaintiffs were allowed to recover in tort from Colonial since no showing of fraud or injustice was required.[10]

The stricter standard applied to contract claims has been recognized and applied by several lower Texas courts subsequent to *Bell* and *Gentry*. See, e.g., *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d 712, 717 (Tex.Civ.App.— Dallas 1977, writ ref'd n.r.e.) (court held that "additional compelling facts" must be present to pierce in a contract case and found that no showing of fraud or injustice had been made by plaintiff); *Angus v. Air Coils, Inc.*, 567 S.W.2d 931, 933 (Tex.Civ. App.—Dallas 1978, no writ) (court acknowledged contract-tort distinction drawn in *Gentry* and refused to disregard corporate entity and impose corporation's contractual indebtedness on individual incorporator and director of business absent evidence of fraud or bad faith); *Siboney Corp. v. Dresser Industries, Inc.*, 521 S.W.2d 639, 642–43 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (court recognized contract-tort distinction and refused to hold

a subsidiary is a mere agent or conduit of the parent, the corporate veil may be pierced. *Bell* does contain some language that appears to support this view. *See, e.g.,* 431 S.W.2d at 339 ("The question is, were [the subsidiaries], despite their corporate forms, mere agents of [the parent]?"); and at 340 ("Courts will not disregard the corporate fiction ... except where it appears 'the individuals are using [it] as a sham ... to avoid personal liability....'") (quoting *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 202 (Tex.1962)). These statements, however, are inconsistent both with the majority of *Bell*'s expressions of the rule and with *Bell*'s result. *Bell*'s language about piercing the corporate veil when the corporation is "a sham ... to avoid personal liability" clearly cannot be considered to express the essential thrust of that case, since the avoidance of personal liability is one of the primary purposes of the corporate form of doing business. As the United States Supreme Court noted in *Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944), "[n]ormally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose." *Id.* at 361, 64 S.Ct. at 537.

**10.** Subsequent Texas Supreme Court cases have adhered to the requirement that fraud or injustice must be present in order to pierce the corporate veil in a contract case. In *Torregrossa v. Szelc,* 603 S.W.2d 803 (Tex.1980), the plaintiff sought to hold a stockholder liable for

breach of an implied warranty of title of a used car he purchased from H.E.D. Sales, Inc. The supreme court, in reversing judgment for the plaintiff, found that H.E.D. Sales, Inc. had observed the requisite corporate formalities and that the plaintiff had not been misled into believing that he was dealing with an individual rather than a corporate entity. Although H.E.D. Sales, Inc. had the minimum capitalization allowed by law, the court noted that "there is no showing that this was an unfair device designed to achieve an inequitable result." *Id.* at 804.

By contrast, in *Sagebrush Sales Co. v. Strauss,* 605 S.W.2d 857 (Tex.1980), the jury found that the defendant, Strauss, had intentionally misled the plaintiff, Sagebrush, a seller of construction materials, into believing that he and the corporations under which he did business were one and the same. In holding that there was some evidence to support the jury's finding, the supreme court noted that Strauss had sent Sagebrush misleading checks and financial statements, and that he had remained silent when Sagebrush sent him invoices that indicated that Strauss and his corporations were the same entity. In holding for Sagebrush, the court said:

Here the jury found that the affairs of the respondent entities, which were all owned and controlled by Richard C. Strauss, were indistinguishable from his personal affairs *and* that he acted in such manner as to lead Sagebrush to reasonably believe that the entities in question had reference to himself.

*Id.* at 860–61 (emphasis added).

parent corporation liable for subsidiary's debts where subsidiary not operated for fraudulent or improper purposes, and plaintiff did not advance credit to subsidiary on basis of parent's guarantees).[11]

**11.** Moreover, numerous lower courts in Texas have, subsequent to *Bell* and *Gentry*, also applied the rule that fraud or injustice is required in a contract claim before the corporate veil will be pierced, but have done so without expressly acknowledging the contract-tort distinction as explained by the Texas Supreme Court. *See, e.g., Norton v. Integral Corp.,* 584 S.W.2d 932, 935 (Tex.Civ.App.—Austin 1979, no writ) ("separate entity of corporations will be observed by the courts, even in instances where one may dominate or control the other, or may even treat it as a mere department, instrumentality, or agency of the other"); *Mortgage & Trust, Inc. v. Bonner & Co.,* 572 S.W.2d 344, 349 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.) (corporate existence not disregarded "unless there is such a unity that the separateness of the corporation has ceased to exist … *and …* adherence to the fiction of the particular corporation would, under the particular circumstances, sanction fraud or promote injustice") (emphasis added); *Holmes v. Clow,* 533 S.W.2d 99, 106 (Tex.Civ.App.—Tyler 1976, no writ) ("Generally speaking the courts will not disregard the corporate entity and treat it as the alter ego of an individual unless it is shown that there is such unity of interest and ownership that the individuality of the corporation and the owner or owners of its stock has ceased and that the observance of the fiction would sanction fraud or promote injustice").

**12.** In holding in the instant contract case that a parent corporation could be held liable for a subsidiary's liabilities without any showing that the parent had used the subsidiary for fraudulent or improper purposes, the panel opinion makes no reference to the tort-contract distinction drawn by the Texas Supreme Court in *Gentry.* The panel's conclusion that, under Texas law, the corporate veil can be pierced solely upon a showing that a subsidiary serves as a mere tool or agent for the parent, rests primarily upon three cases: *Jetty, Inc. v. Hall-McGuff Architects,* 595 S.W.2d 918 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Tigrett v. Pointer,* 580 S.W.2d 375 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.); and *National Marine Service, Inc. v. C.J. Thibodeaux & Co.,* 501 F.2d 940 (5th Cir.1974). *Jetty* and *Thibodeaux,* while reaching results consistent with our reasoning and holding here, did so on the basis of reasoning inconsistent with the current law of Texas on piercing the corporate veil in a contract case; whereas *Tigrett* simply does not support the panel.

■ Thus, we believe that the panel erred in concluding that, in a contract case, a plaintiff need only show that a subsidiary is a mere agent or conduit of the parent to pierce the corporate veil.[12]   A showing that

*Jetty, Inc. v. Hall-McGuff Architects, supra,* involved a suit by an architectural firm against a parent corporation and its subsidiary for which the architects were to plan and build offices. Even though the architectural firm had contracted with the subsidiary, the parent was held liable for its debts. The court rested its opinion on the holding that the mere showing that a subsidiary is a "mere tool or business conduit" of the parent is sufficient to disregard their separate identities, yet the court failed to draw any distinction between tort and contract claims as required in *Bell* and *Gentry.* Moreover, we note that in *Jetty,* the parent had engaged in conduct that could have led the creditor to believe that the parent was liable for, or would stand behind, the debts of the subsidiary. Thus, although *Jetty's* rationale is inconsistent with the distinction mandated by *Bell* and *Gentry,* the result the court reached was, in the circumstances presented, in compliance with Texas law.

*Tigrett v. Pointer, supra,* is not persuasive authority for the rule applied by the panel. *Tigrett* involved an individual who was the sole owner of several sister corporations, rather than a parent corporation with a subsidiary. In *Tigrett,* the court found that the sole shareholder had used one corporation as part of a scheme to place the assets of a second corporation, itself grossly undercapitalized, beyond the reach of its creditors, thereby preferring himself over the other creditors in violation of his fiduciary duty to the insolvent second corporation. While the court did state that "[w]hether [the sole shareholder] misled [the other creditors] or subjectively intended to defraud them is immaterial," *id.* at 385, it explained that this was because, "[i]n the circumstances shown here, this action was so grossly unfair as to amount to constructive fraud.…" *Id.* The *Tigrett* court expressly employed the test set out by the supreme court in *Bell,* holding that the corporate fiction would be disregarded only when the corporation was an unfair device that was likely to be or had been used to achieve an inequitable result. *Id.* at 382, 386. On motion for rehearing, the *Tigrett* court emphasized that the recipient corporation was liable because it "was an integral part of [the shareholder's] scheme to place [the other] company's assets beyond the reach of its creditors," *id.* at 400, and because the two corporations had no separate identities.

We recognize that the *Tigrett* court did state on motion for rehearing that "[i]f the relationship between several corporations is such that they constitute a single business enterprise, a creditor may attack the separate identity of each without showing that he dealt with all of them."

the subsidiary was used by the parent for fraud or injustice must also be present.

■ Such a showing has not been made in this case. As we noted at the outset, the district court found that "[Edwards] has failed to show that Monotronics was incorporated for an illegal, fraudulent, or improper purpose, that Monogram employed inequitable means to place [Edwards] in a position of disadvantage, or that [Edwards] acted to his detriment as a result of misrepresentations made by Monogram." Record Vol. III at 760. This finding is borne out by the record.[13] Edwards' chief financial officer testified that shipments made to Entronic during the spring and summer of 1978 were made without any assurance or representation from Monogram that it would stand for Entronic's debts. Moreover, no evidence was introduced to indicate misplaced reliance on misleading conduct by Monogram. Nor did Monotronics prefer itself as a creditor of Edwards. In fact, none of the loans (aggregating approximately $2,100,000) made by Monogram to Entronic was ever repaid. Thus, Edwards relied on Entronic's credit and its credit alone. Even after Edwards had difficulty obtaining payment from Entronic, it continued to advance credit to Entronic in excess of $350,000. Because Edwards has failed to show that there has been any fraud or injustice, it has not met the requirements for piercing the corporate veil in a contract case under Texas law.

## III. THE QUESTION OF MONOTRONICS' SEPARATE EXISTENCE.

■ Although it is unnecessary for us to address the issue of Monotronics' separate existence since Edwards has made no showing of fraud or injustice, we do so in order to dispel the panel's notion that, based on the facts of this case, Monotronics could be properly characterized as nothing

*Id.* However, none of the cases the *Tigrett* court cites in support of this proposition involved a suit in contract. *Allright Texas, Inc. v. Simons,* 501 S.W.2d 145 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ refused n.r.e.), was a tort case; *Mull v. Colt Co.,* 31 F.R.D. 154 (S.D.N.Y.1962), and *Walkovsky v. Carlton,* 24 A.D.2d 582, 262 N.Y.S.2d 334 (1965), are non-Texas tort cases; and *State v. Lone Star Gas Co.,* 86 S.W.2d 484 (Tex.Civ.App.—Austin 1935, writ ref'd n.r.e.), was a gas rate case decided thirty years before *Gentry.* Thus, while this language from *Tigrett* may appear to conflict with the requirements for contract claims set forth in *Bell* and *Gentry,* it is important to recognize that all the corporations in *Tigrett* were a part of the fraud against the plaintiff.

Finally, in *National Marine Service, Inc. v. C.J. Thibodeaux & Co., supra,* the parent corporation had a boat that it wanted to charter, but it did not want to compete openly with its customers. It formed a partnership, Prairie Company, to charter the boat. A fictitious charter party was entered into between Prairie Company and River Gulf, a corporation that had been formed by an employee of the parent, but that had previously been undercapitalized and inactive. River Gulf was given the legal minimum of capital.

When a shipyard sued for payment for repairs made to the boat, it found that River Gulf was defunct and had no assets. The district court held Prairie Company and its parent liable. The defendants maintained that a showing of fraud was necessary before they could be held liable. In affirming the district court, the *Thibodeaux*

court conceded that there had been no fraud, but held that the corporate entity could be disregarded "where there is gross undercapitalization *or complete domination of the corporate entity under scrutiny.*" 501 F.2d at 942 (emphasis added). While the latter part of this statement supports the panel's position, there is no indication that the *Thibodeaux* court was applying Texas law; the statement is supported by citations to two United States Supreme Court cases (each of which involved the fairness of a plan of reorganization under § 77b of the Bankruptcy Act of 1898) and a treatise and casebook on general corporation law. We note that *Thibodeaux* was brought under both diversity and admiralty jurisdiction, 501 F.2d at 942. Moreover, even if *Thibodeaux* is considered a statement of Texas law, it has been modified by the Texas Supreme Court's subsequent decision in *Gentry.* Finally, even if the *Thibodeaux* court was of the view that mere domination was a sufficient showing to pierce the corporate veil under Texas law, the facts of the case reveal that there was an "additional compelling fact:" The defendants had used a fictitious charter party as a means to avoid paying for repairs made to the vessel. Thus, while the law espoused by the *Thibodeaux* panel cannot be said to represent Texas law on piercing the corporate veil in a contract case, the result is in accordance with *Bell.*

**13.** The panel agreed with the district court's finding that there had been no showing of fraud or injustice. *See* 700 F.2d at 998–99.

more than "a piece of paper lying in a file cabinet...." 700 F.2d at 1003.

The panel recognized that

[t]he fact that Monogram owned 100 percent of the stock in Monotronics does not, in and of itself, defeat their separate existence. Nor does the fact that they filed a joint tax return defeat their separate existence. Interlocking officers and directors does not suffice, either. Nor will it suffice that one corporation has loaned money to another.

700 F.2d at 1003. Nevertheless, the panel found that Monotronics existed "in name only," *id.* at 1004, because "[all] the directors and officers of Monotronics were ... directors and officers of Monogram," and "[w]hen the Monogram/Monotronics officers and directors acted, they acted for Monogram." *Id.* The panel decided that "Monotronics did not participate [in] the major decisions of Entronic's very life," because "Monotronics exercised no control over the relocation of Entronic Company's plant from Missouri to Texas or over the doubling of the size of the plant." 713 F.2d at 142. Such a conclusion was reached because "[n]o minutes were recorded in Monotronics's records about these matters or about the firing of Entronic's president, Al Hayes." *Id.* The panel also found that "without authorization or ratification from Monotronics, Monogram poured over $484,000 into Entronic between July and October 1977." *Id.* In sum, although Monotronics had observed "a few formalities," 700 F.2d at 1004, the panel held that "Monotronics had no mind of its own, no body of its own, no will of its own, and, indeed, no existence of its own." 713 F.2d at 142.

Our review of the district court's findings of fact and the record itself paints a different picture. From the start, Monotronics was more than "just a piece of paper." At its creation, Monotronics was infused with nearly $1,800,000 in cash, which was used primarily to acquire seventy-five percent of the stock of Entronic Corporation. Following Monotronics' acquisition of Entronic Corporation, this $1,800,000 remained on Monotronics' books, represented by cash and its investment in Entronic Company, the latter being initially augmented by Monotronics' share of Entronic's post-acquisition profits and subsequently diminished by its share of Entronic's precipitous losses. Moreover, the record is replete with resolutions passed by Monotronics' Board of Directors. For example, there are minutes reflecting the election of officers; the decision to purchase Entronic Corporation stock; the formation of Entronic Company; the authorization of nearly $1,400,000 in loans to Entronic Company from Monogram; the approval of a $640,000 loan to Entronic Company from the Bank of America; the authorization of Monotronics' directors to enter into agreements with creditors on behalf of Entronic Company; and the decision to sell Monotronics' partnership interest to Newco. Defendant's Exhibit 16. The record also contains several resolutions adopted by Monotronics' sole shareholder, Monogram, regarding, *inter alia*, the election of directors, the purchase of Entronic Corporation stock, and the sale of Monotronics' partnership interest in Entronic Company. *Id.*

The financial records of Monotronics were kept separate from those of Monogram, and inter-company loans were carefully recorded on the books of each, including accrued interest payable and receivable. Defendant's Exhibits 21–22. Of the $2,100,000 advanced by Monogram to Entronic to be used for working capital or construction, approximately $1,350,000 was evidenced by promissory notes signed by either Philip Ball, vice-president of Monotronics, or Leonard Hutchinson, Monotronics' treasurer.

That all of Monotronics' officers and directors were tied to Monogram does not make Monotronics "a mere shadow" of Monogram. As the Texas Supreme Court noted in *Gentry, supra,* "[a] subsidiary corporation will not be regarded as the alter ego of its parent because of ... a duplication of some *or all* of the directors or officers...." 528 S.W.2d at 573 (em-

phasis added). The panel's premise that " 'Monotronics' did nothing" is also refuted by the testimony by Monotronics' officers, which described actions taken on behalf of Monotronics. Martin Stone, president of Monotronics, regularly received and reviewed financial information relating to the business of Entronic Company, and he hired and fired Entronic's general managers. Record Vol. V at 348–49, 386–87.[14] Philip Ball testified that he and most of Monotronics' other officers reviewed Entronic's financial statements, Record Vol. IV at 103, and Leonard Hutchinson testified that he made trips to Entronic's Texas facility on behalf of Monotronics. *Id.* at 167.[15] In addition, Ronald Sidorchuk described his duties as assistant treasurer of Monotronics, which included obtaining financing for Entronic and supervision of Monotronics' funds. Record Vol. V at 275–77. The panel's assumption that the officers of Monotronics took no action on behalf of Monotronics is therefore unsupported by the record.

The panel's determination that Monotronics failed to participate in Entronic's business affairs is also based on the fact that there are no minutes reflecting actions taken by its Board of Directors with regard to the firing of Entronic's general manager or the relocation of Entronic's plant from Missouri to Texas. Because Monotronics was the general partner of Entronic and those actions were material to Entronic, we agree that it would have been preferable for those actions to have been reflected in the corporation's minutes. Yet it can hardly be said that Monotronics did not participate in or authorize these decisions. Stone and Ball comprised two-thirds of Monotronics' three-member Board of Directors[16] and made the critical decisions regarding Entronic. For instance, Ball testified that he and Stone conferred before deciding to fire Entronic's general manager, Al Hayes. Record Vol. IV at 106. While this decision may not have been memorialized in the form of corporate minutes, it would be elevating form over substance to argue that it was made without the consent and approval of Monotronics' Board of Directors. Furthermore, Ball also testified that minutes of Board action were kept only when required by law or by an outside party. *Id.* at 92–93. Although, again, it would have been preferable for Monotronics' board to have recorded all of its actions in the form of minutes, the failure to have recorded some of those actions does not obscure the fact that Stone and Ball were intimately involved in the critical decisions concerning Monotronics and Entronic, and that they were empowered to and did act on behalf of Monotronics' Board of Directors.[17]

Undoubtedly, Monotronics was ultimately controlled by Monogram. This will always be the case where a parent corporation has a wholly-owned subsidiary. It does not necessarily follow, however, that the subsidiary has no separate existence. Here, the record shows that Monotronics was more than "just a piece of paper."

---

**14.** That Stone acted in his capacity as president of Monotronics was shown when Edwards' counsel asked him: "Do you know of anybody else at *Monotronics* that ever hired or fired anybody at Entronic Company?" Record Vol. V at 387 (emphasis added).

**15.** Hutchinson was asked whether one of his visits to Entronic's Texas plant "was in performance of your duties as treasurer of Monotronics?" He replied, "That's correct." Record Vol. IV at 167.

**16.** Article VI, Section 6 of Monotronics' by-laws provide in pertinent part:

Two-thirds of the directors shall constitute a quorum for the transaction of business unless a greater number is required by law or the articles of incorporation. The act of a majority of the directors present shall be the act of the board of directors, ....

Defendant's Exhibit 1.

**17.** The panel also found significant the fact that "[n]o effort was ever made to get consent of Entronic Company's limited partners to business decisions concerning Entronic." 700 F.2d at 997. We note, however, that Article VIII of the limited partnership agreement provided that "[t]he business of the partnership shall be under the exclusive management of the general partner. The limited partners shall not participate in the management of the business of the partnership." Plaintiff's Exhibit 13. This provision is, of course, designed to maintain limited liability for the limited partners. Under the circumstances, we doubt that the limited partners would have wanted to be consulted!

Thus, we believe the panel incorrectly concluded that Monotronics was not separate from Monogram.

The judgment of the district court is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, with whom TATE and HIGGINBOTHAM, Circuit Judges, join, concurring:

This is a diversity case in which we follow Texas law. Majority opinion, n. 5. The thorough and scholarly opinion is devoted in major part to a detailed analysis of Texas decisions, the remainder to a discussion of the facts of this case. I agree with the interpretation of Texas law reached by the majority but I tread diffidently in that field. The Texas jurisprudence is not pellucid, and the result we reach might be overturned by the decision of any of the Texas Courts of Appeals or its Supreme Court.

The Federal Rules of Appellate Procedure caution that "a hearing or rehearing en banc is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional circumstance." Fed.R. App.P. 35. This case does not meet either criterion. Therefore, I voted against its consideration en banc. Once again, I suggest that the resources of our fourteen-judge en banc court should be reserved for cases worthy of that effort. *See Nash v. Estelle*, 597 F.2d 513 (5th Cir.1979) (en banc) (Rubin, J., dissenting).

E. GRADY JOLLY, Circuit Judge, with whom JOHNSON and WILLIAMS, Circuit Judges, join, dissenting:

The majority opinion has made amply clear that Texas cases, as we have noted continuously from the beginning of our writings in this case, can be, and are in fact, cited as authority for nearly any position one seeks to advance on the subject before us. The panel opinion recognized both this fact and the fact that this was a diversity case in which we had no authority "to decide policy or to plot a course for Texas corporate law. That job, it seems to

us, is for the Texas courts." *Edwards Company, Inc. v. Monogram Industries, Inc.*, 713 F.2d 139, 140 (5th Cir.1983) *on rehearing*. The panel opinion was "carefully and deliberately restricted to its facts" and demonstrated Texas authority to support its conclusion.

On the other hand, the majority opinion here does not merely interpret Texas law, but in its dogmatic assertions decides doubtful legal questions which the Texas courts, for whatever reasons, have plainly avoided deciding.

In response to Part III of the majority opinion, I continue to adhere to my belief that when all was said and done, and when the record is read and weighed as a whole, Monotronics was nothing more than a piece of paper in a file cabinet in Santa Monica, California, and for all practical purposes existed in name only. It was, in my view, a mere conduit for Monogram.

There is no need, however, to fight battles which are clearly and decisively lost and Judge Randall's able pen has commanded an impressive majority. It does not detract from her power and persuasiveness to say in closing that this diversity case, limited to its facts as it was, was hardly worth en banc consideration.