SABINE TOWING & TRANSPORTA-
TION CO., INC. et al.

v.

MERIT VENTURES, INC.

Walter BLESSEY, Jr. et al.

v.

MERIT VENTURES, INC.

Civ. A. Nos. B–81–940–CA, B–83–554–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 5, 1983.

Kent E. Westmoreland, Ross, Griggs & Harrison, Houston, Tex., Frederick L. Benckenstein, Benckenstein, Oxford, Radford, Johnson & Nathan, Beaumont, Tex., for plaintiffs.

Thomas A. Peterson, Peterson, Petit & Peterson, Beaumont, Tex., Richard L. Fuqua, Houston, Tex., for defendant.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

Plaintiffs Sabine Towing and Transportation Company, Inc., Waxler Towing Co. and two individuals brought this admiralty suit to recover for the breach of certain maritime charter agreements between plaintiffs and Merit Transportation Company, a subsidiary of Merit Ventures Incorporated. The suit is brought against Merit Ventures, the parent corporation, on the ground that Merit Ventures was the "alter ego" of Merit Transportation, and thus should be liable for its debts. The plaintiffs further allege that the defendant tortiously interfered with plaintiffs' contracts with Merit Transportation, and is liable on that ground.

The court heard the case under its admiralty jurisdiction, and by agreement of the parties, the testimony of only one live wit-

ness was heard, and the rest of the case was submitted by deposition. In addition, both parties submitted extensive post trial briefs. After careful review of ·the evidence and the briefs, the court finds that Merit Ventures was indeed the alter ego of Merit Transportation, and judgment must be entered for the plaintiffs. Having reached this result, the court does not reach the question of tortious interference with plaintiffs' contracts.

## I. FACTS

In late 1979, Tom Battle, Sam Dumas and Anton E. Meduna (the "Owners") were the proprietors of Merit Petroleum Company, a corporation engaged in crude oil trading, located in Houston, Texas. Sensing a favorable business climate, the owners decided to diversify their business interests. To do this, the owners in November 1979 created Merit Ventures Incorporated and three subsidiaries: Merit Properties Inc., Merit Exploration Inc. and Merit Refining Inc. From the beginning Merit Ventures owned 100% of these subsidiaries. The parent corporation and its subsidiaries had overlapping officers and directors. At all times Merit Ventures and it subsidiaries shared the same offices. Incoming telephone calls for the parent or any of the subsidiaries were handled by a receptionist who simply answered "Merit Ventures."

During the early summer of 1980, the Merit Ventures owners decided to enter the marine transportation business. They met with Dennis Kirkonis, a man with extensive experience in the barge industry, and discussed the creation of a barge operating company. During this meeting, Kirkonis pointed out to the Merit Venture officials that the barge industry was about to go into a deep recession, a prediction borne out by subsequent events. Despite this prediction (or, as plaintiffs allege, because of it) the decision was made to enter the barge business. The Owners transformed Merit Refining Company, a subsidiary that had never conducted any business, into Merit Transportation Company. Kirkonis was named as president; and was given

twenty percent ownership of the subsidiary. The initial capitalization of the company was $300,000, a sum felt to be inadequate by Kirkonis, who believed, based on his experience, that $800,000 would have been a better figure. Kirkonis believed that $500,000 would be needed to cover accounts from third parties, and that $300,-000 would only cover primary start-up. Nevertheless, Kirkonis was apparently not too concerned about the initial undercapitalization, believing Merit Ventures would make up any deficiency in capital for its subsidiary.

Merit Transportation commenced business in August, 1980. The company rented barges and tugs to other companies. It owned no boats of its own, but would charter vessels from other companies. It was the breach of these charter agreements after Merit Transportation became insolvent that gave rise to this lawsuit. Shortly after Merit Transportation began operation, Waxler Towing Company entered into a charter party agreement with the new company. By this agreement, Waxler chartered for hire one complete "tow", consisting of a tug and several barges, fully crewed and supplied. The charter party covered a one-year period through November, 1981. In April, 1981, Sabine Towing and Transportation Company, Inc. entered into two one-year charter agreements pursuant to which Sabine Towing hired out four tows. In November, 1980, Walter Blessey and Richard Wilson entered into a bareboat charter agreement with Merit Transportation whereby they agreed to lease to the company the WEB 162, a newly constructed barge owned jointly by them. This charter agreement was to last for a three year period, ending in December, 1980.

Merit Transportation chartered barges from one other company that deserves mention. This was Merit Equipment Company, another subsidiary of Merit Ventures. It had been formed about the same time as Merit Transportation, for the express purpose of purchasing barges. Merit

Transportation used several of the barges it purchased.

During the first six months of operation, Merit Transportation made a profit. Soon, however, the owners were seeking additional capital to keep the business afloat. On or about March 31, 1981, in an action that has figured prominently in this litigation, Merit Transportation borrowed $1,000,000 from the Greenspoint Bank of Houston. The loan was secured by the accounts receivable of Merit Transportation; but it was also guaranteed by Merit Ventures, and by the individual guarantees of two Merit Ventures' owners. Despite the fact that Merit Transportation made the loan, almost immediately afterwards $260,000 was advanced to Merit Equipment to allow that company to make payment on a barge construction project and to pay off certain debts. This sort of inter-subsidiary loan was not uncommon with the Merit Ventures group. Indeed, Merit Transportation received several such loans from sister companies itself. Furthermore, Merit Ventures, the parent, advanced money to Merit Transportation throughout the life of the subsidiary.

From April to August the company operated at a gross profit, as the gross revenues exceeded the cost of barge operation. Yet the general and administrative expenses drained those profits, and caused it to operate at a net loss. As the year wore on, it became apparent that Kirkonis' prediction about a severe downturn in the barge industry was being borne out. A review of Merit Transportation's finances shows that by September, 1981, the company was losing money heavily.

In light of the depressed situation, a decision was made to get out of the marine transportation business. During the early part of November, 1981, Merit Ventures officials informed Kirkonis of this decision and told him that no more funds would be advanced to Merit Transportation. Kirkonis, realizing the company would soon collapse, arranged for a rival towing company to offer to take over several of Merit Transportation's contracts. The owners re-

jected this offer. On November 13th, 1981, a meeting was held between the Merit Ventures' owners, Kirkonis, and Merit Ventures' legal counsel. A decision was made at this meeting to sell Merit Transportation and to cancel its further operations. The testimony of the Merit Ventures owners reveals that no concern was expressed regarding the effects of this decision on any third party contracts. On the same date, a final payment in the amount of $251,000 was made on the Greenspoint Bank loan. An earlier payment of $700,000 had been made in mid-September. These payments extinguished Merit Ventures' liability on the loan, but impeded Merit Transportations financially and its ability to pay its creditors.

On November 16th, all Merit Transportation employees were terminated. Merit Ventures then directed an employee to take over the Merit Transportation's management. The employee's main duty was to contact the companies whose equipment Merit Transportation had under lease and tell them that Merit Transportation was defunct and had no further use for their property. On November 24th, all of Merit Transportation's stock was sold for $1,250 to Far West Transportation Company. Far West had been created a short time before the sale for the express purpose of acquiring Merit Transportation. It was owned by two men, B.D. Shipwash and Ralph Keen, who were acquaintances of Richard Fuqua, Merit Venture's attorney. Neither were knowledgeable in the marine transportation business, but were experienced in dealing with the problems of financially troubled companies. Almost immediately Keene and Shipwash transferred approximately $300,000 from Merit Transportation to Far West. Sabine Towing, concerned about payment on its contracts, filed a garnishment action against Merit Transportation, effectively freezing its accounts. Shortly thereafter, Merit Transportation's new owners filed Chapter Eleven bankruptcy proceedings for the company. Realizing that Merit Transportation was insolvent, plaintiffs brought this action against the parent.

## II. CONCLUSIONS OF LAW

### A. PIERCING THE CORPORATE VEIL

It is well-established that this court, as a court of admiralty jurisdiction, has the power to pierce the corporate veil of the defendant corporation. *Swift and Company Packers v. Compania Columbiana Del Caribe S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). Whether the corporate veil should be pierced depends on the findings of fact in each particular case. Though case law has developed general rules regarding when a court should exercise its power, each case is *sui generis* and must be judged within its own context. See *Bordagain Shipping Co. v. Saudi-Arabian Lines S.A.*, 1979 A.M.C. 1058 (E.D.La.1978) affirmed per curiam 623 F.2d 710 (5th Cir.1980). Furthermore, though the court may find the law of one particular state, such as Texas, persuasive, the law to be applied in such cases is federal common law. See *Talen's Landing Inc. v. M/V Venture*, 656 F.2d 1157 (5th Cir. 1981). See also *Edwards Co., Inc. v. Monogram Industries, Inc.*, 713 F.2d 139 (5th Cir.1983).

A trial court should pierce the corporate veil and require a parent corporation to answer for the debts of a subsidiary when the subsidiary conducts business in a manner that clearly indicates that the parent is an alter ego of the subsidiary. *Markow v. Alcock*, 356 F.2d 194 (5th Cir.1966). To find an alter ego relationship, the evidence must disclose a pattern of control or domination of a corporation by an individual or corporation, and that this domination was used to support a corporate fiction. *Bordagain Shipping*, supra at 1072, 623 F.2d 710. Once that is established, it will be appropriate to disregard a corporate entity when it appears a corporation was organized for fraudulent or illegal purposes. Furthermore, it is quite clear that the veil should be pierced when it will prevent manifest injustice to third parties. *Talen's Landing*, supra at 1160 citing *Houston Oil Field Material Co. v. Stuard*, 406 F.2d 1052, 1054 (5th Cir.1969).

Since each case must be judged on its own facts, no set formula has been created to decide when an alter ego relationship will be found. Historically, however, courts have used some fifteen to twenty-five factors in deciding the issue. Some courts have carefully delineated the factors they have used. See e.g. *Andrew Martin Marine v. Stork-Werkspoor Diesel*, 480 F.Supp. 1270 (E.D.La.1979), *Bay Sound Transportation Co. v. United States*, 350 F.Supp. 420 (S.D.Tex.1972). The court finds this listing of factors an appropriate approach and adopts it here; and after a review of the existing case law, has developed a list of fifteen relevant factors applicable in this case. The factors are as follows:

1. *Common or overlapping stock ownership between the parent and the subsidiary.* This was a factor in *Talen's Landing,* supra. In the present case, the parent Merit Ventures owned 100% of all its subsidiaries except for Merit Transportation. The parent owned eighty percent of Merit Transportation; but the other twenty percent was given to Kirkonis as part of remuneration for serving as president. The record reveals no loss of control because of this move.

2. *Common or overlapping directors and officers.* This was another factor in *Talen's Landing.* It is present here. Though most of Merit Transportation's officers were different from the other Merit companies, the same three men, Dumas, Battle, and Meduna, were on the board of directors of all the companies. Larry Morris was on the board of all the companies except Merit Transportation; but he was an officer in that subsidiary. Furthermore, and perhaps most important, Morris served as chief financial officer of all the Merit companies, responsible for the books and accounts of the corporations.

3. *Use of Same Corporate Office.* This factor, present in the instant case, has been cited in several decisions. It is important here, not only because it allowed a great deal of interrelationship between the companies, but because it means third parties

could reasonably believe that there was only one company, instead of several.

4. *Inadequate Capitalization of the Subsidiary.* Kirkonis, president of the corporation, testified concerning what he believed an adequate figure would be for the initial capitalization of Merit Transportation—a figure $500,000 higher than what was actually provided. Kirkonis was the only man involved in creating Merit Transportation who had had experience in the barge business. It is obvious that his advice about capitalization was not followed because Merit Ventures fully expected to provide the needed funds. This factor was cited in *Markow v. Alcock,* supra.

5. *Financing of the subsidiary corporation by the Parent.* Morris, the financial officer of all the companies, testified that if Merit Transportation ran short, money would be advanced to it from the parent or the sister companies. At different times, salaries and other expenses were paid on behalf of Merit Transportation by Merit Ventures. It is apparent from the evidence that Merit Ventures' decision to stop lending funds to Merit Transportation caused the final collapse of the subsidiary.

6. *Whether the Parent existed solely as a Holding company for its subsidiaries.* This factor has been stipulated in this case. Merit Ventures had no business of its own; it existed merely to run its subsidiaries. See *Texas Industries, Inc. v. Lucas,* 634 S.W.2d 748 (Tex.App.1982).

7. *The Parent's use of the subsidiary's property and assets as its Own.* The evidence discloses that often Merit Transportation would be directed to loan funds to its sister subsidiaries. A prime example is the $260,000 advance made to Merit Equipment in April, 1981. Much of this money was used simply to pay Merit Equipment's operating expenses. Yet Merit Transportation paid interest on the full $1 million. It is undisputed that Merit Venture's owners had signature authority on Merit Transportation's checking account.

8. *The Nature of Intercorporate Loan Transactions.* In *Talen's Landing,* supra, the Fifth Circuit found striking the informality of loans between the Talen's Landing parent and its subsidiary. A similar informality is evident here. Many "loans" were made between Merit Transportation and its sister companies. Yet they were made with no formal loan documentation and no interest was charged.

9. *Incorporation of the Subsidiary being caused by the Parent.* This factor is present without question in the instant case.

10. *Whether the Parent and the Subsidiary file Consolidated Income Tax Returns.* Under Section 1501 of the Internal Revenue Code, a corporation may file a joint return with its subsidiaries when the parent owns at least eighty percent of the subsidiary. This practice was followed by Merit Ventures with all its subsidiaries. It allows a parent corporation to shelter taxable income from a profitable subsidiary by offsetting it against losses from an unprofitable subsidiary. It is a routine business practice; and as defendant's counsel ably pointed out, it is a practice followed by plaintiff Sabine Towing and its parent, Chromalloy Inc. In this context, however, in light of other factors indicating corporate domination, it becomes another factor in proving the alter ego relationship. Indeed, it explains why Merit Ventures retained exactly eighty percent of Merit Transportation when the company was created.

11. *Decision-Making for the Subsidiary made by the Parent and its Principals.* Kirkonis testified that it was his understanding that he was to report to Sam Dumas, who, he assumed, was the Merit Ventures' representative on the Merit Transportation board of directors. The testimony of third parties reveals that it was widely believed that Merit Transportation was a mere adjunct of the parent and that Kirkonis had no authority to act. It is obvious that Larry Morris, not Kirkonis, made the major financial decisions involving the subsidiary; and it is clear that Morris acted at Merit Ventures' behest. It was Morris, not Kirkonis, who negotiated the million dollar loan from Greenspoint

Bank. Kirkonis never saw the note or loan documentation. Furthermore, it was Merit Ventures that decided Merit Transportation would purchase barges from Merit Equipment. This factor was discussed in *Edwards v. Monogram,* supra.

12. *Whether the Directors of the Subsidiary act Independently in the Interest of the Subsidiary or in the Interest of the Parent.* This is a significant factor here, because of the duplication of directors among the Merit subsidiaries. It is painfully apparent that Merit Transportation's directors acted on the parent's orders. The decision to pay off the Greenspoint Bank loan at a time when Merit Transportation was in serious financial difficulty is an apt example. It benefitted Merit Ventures, but crippled Merit Transportation.

13. *The Making of Contracts between the Parent and the Subsidiary that are more favorable to the Parent.* Merit Equipment, which chartered vessels to Merit Transportation, was also under the control of Merit Ventures. An analysis of the financial records involving the two subsidiaries indicates that the barges it leased to Merit Transportation could not be used profitably. The result was that while Merit Transportation was losing money, Merit Equipment was showing a profit. In effect, this resulted in Merit Transportation's assets being used to pay for Merit Equipment's barges.

14. *Observance of Formal Legal Requirements.* This is a factor cited in *Markow,* supra. It cannot be stated with certainty whether Merit Transportation observed all the formal legal requirements expected of a corporation. Merit Transportation's corporate records have disappeared in mysterious circumstances. Nevertheless, Kirkonis testified that he could not recall any formal shareholder's or director's meetings being held. This information coming from the president of the corporation, leads to a conclusion that at least one important aspect of the corporate entity was ignored.

15. *The Existence of Fraud, Wrong-doing or Injustice to Third Parties.* The events surrounding the final days of Merit Transportation indicate there was an injustice done to the company's creditors. Suddenly, in November, 1981, plaintiffs found the corporation they had done business with sold and the payments on their contracts stopped. Furthermore, the corporation was sold to men who had no experience in the barge business; but who were familiar with handling failing corporations. Almost immediately after the sale to these men $300,000 was transferred from Merit Transportation to Far West, the company they had created to acquire Merit Transportation, a loan that is unsecured and documented only in the board minutes of Far West. Shortly thereafter, Merit Transportation went into bankruptcy. Certainly the circumstances indicate that these final maneuverings were designed to keep creditors from reaching Merit Transportation's remaining assets.

B. THE SUM OF THE FACTORS.

■ None of the above factors alone would be determinative. Many relate to routine business practices, followed by many companies. Together, however, they lead to a conclusion that Merit Transportation was not a full-fledged corporate entity. A well known and frequently cited law review article, "Insulation from Liability through Subsidiary Corporations" by the late Justice William O. Douglas and Carrol M. Shanks, suggested four standards that a parent corporation should adhere to when shielding itself from identification with a subsidiary. The standards basically are: 1. A separate financial unit should be set up and maintained. 2. The day-to-day business of the two units should be kept separate. 3. The formal barriers between the two management structures should be religiously observed. 4. The two units should not be represented as being one unit. Those with whom they come into contact should be kept informed of their separate identity. Douglas and Shanks, *Insulation from Liability Through Subsidiary Corporations,* 39 Yale L.J. 193 (1929) cited in *Texas Industries v. Lucas,*

supra at 752, 753. See *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571 (Tex.1975). A review of the above factors reveal that Merit Ventures met none of those standards.

The defendant argues that the corporate veil should only be pierced in extreme circumstances when the court finds a fraudulent scheme results in a sham corporation. The court is convinced, however, that the real question is, given all the factors, would fundamental injustice be done to the creditors if the veil were not pierced? This is the case here. The Merit Venture owners reaped substantial benefit by structuring their subsidiaries in the manner they did; including substantial tax benefits and increased control of the subsidiaries. Having gained the benefit, they should have accepted the burden of adhering to the standards cited above. Clearly, they did not, and must be thus held primarily liable for Merit Transportation's debts. Otherwise, Merit Ventures will profit at the expense of innocent third parties.

### III. DAMAGES

■ Having determined that the corporate veil must be pierced, the court must now determine certain questions of damages. For the most part, the parties have stipulated the amount of damages sustained by the plaintiffs. There is, however, a dispute over the late payment charge in the charter agreement between plaintiff's Blessey and Wilson and Merit Transportation. The charter agreement states "A 1½ % interest charge will be assessed on all payments that are past due more than three working days." The plaintiffs allege that the charge is to be applied *each* month that the payments remain unpaid. The defendant argues that this sum is to apply one time and one time only. Thus, from the date the payment was first late, December 31, 1981, through December 31, 1983, the cumulative interest according to the plaintiff's computation is $39,943.19. Using the defendant's computation, the sum is a paltry $3,048.23. The court finds that defendant's position defies common sense and the plain reading of the contract.

Interest is paid here, not as a penalty, but as consideration for the right to use another's money. To allow only $3,000 for two years use of money would be ludicrous. Blessey and Wilson are entitled to the full amount.

■ Plaintiff Blessey, individually, contends that he is entitled to $47,171.20 in damages because of his being forced to idle one of his personal barges as a result of the Charter breach. This was the situation: Blessey and Wilson each owned fifty percent of the WEB 162, the barge under charter to Merit Transportation. After the breach, Blessey would hire out the WEB 162 before any of his personal barges in order not to deny Wilson income; and as an effort to mitigate damages. Defendant alleges that Blessey was under no obligation to do this; but simply acted as a volunteer. A volunteer is one who undertakes to do that "which is not in pursuance or protection of any interest." 93 C.J.S. *Volunteer*. Here Blessey was avoiding claims that could have arisen from co-owner Wilson, or avoiding an argument that he failed to mitigate. It was in his interest to do this, and he was not a volunteer. Blessey is entitled to damages he sustained as a foreseeable consequence of the breach, including those for his idled barge.

■ Pursuant to the terms of the charter agreement, Blessey and Wilson are entitled to reasonable attorney's fees, which the parties may agree upon, or which this court may set at an appropriate post judgment hearing. The defendant will also be allowed the post judgment opportunity to submit a motion modifying the damage awards if it can prove the plaintiffs did not properly mitigate damages.

### IV. FINAL JUDGMENT

In summary, the Court finds that Merit Ventures Inc. was the alter ego of Merit Transportation Co. Therefore, Merit Ventures is primarily liable for the obligations of its subsidiary. The court, however, finds no need to determine the issue of tortious interference. Plaintiffs Blessey

and Wilson are entitled to recover for all damages claimed by them. It is therefore,

ORDERED, ADJUDGED, and DE-CREED that judgment be entered for plaintiff SABINE TOWING AND TRANS-PORTATION CO. INC. against defendant MERIT VENTURES in the amount of ONE MILLION SIX HUNDRED SIXTY TWO THOUSAND TWO HUNDRED NINETY TWO DOLLARS AND NINETEEN CENTS, plaintiff WAXLER TOWING COMPANY against defendant in the amount of TWO HUNDRED TWENTY SIX THOUSAND ONE HUNDRED FIFTY DOLLARS AND FORTY CENTS, plain-tiffs WALTER BLESSEY and RICHARD WILSON against defendant in the amount of TWO HUNDRED FORTY THOUSAND FIVE HUNDRED NINETY SEVEN DOL-LARS AND FIFTY ONE CENTS, plaintiff WALTER BLESSEY individually against defendant in the amount of FORTY EIGHT THOUSAND ONE HUNDRED SEVENTY ONE DOLLARS AND TWENTY CENTS. Blessey and Wilson may also recover rea-sonable attorney's fees. Interest on the judgment shall accrue at the rate of 9.93% from this date until paid in full.