**BERGESEN d.y. A/S, Plaintiff,**

v.

**Magnus LINDHOLM; Adam Backstrom; Lexmar Corp. (Liberia); Lexmar Corp. (Connecticut); Erwin Shipping S.A.; Lexmar Shipping (U.K.) Ltd.; Atlantic Brands Corp.; Lexington Development Group, Inc.; Starlux Corp.; Pullman Shipping Co., Ltd.; Guvnor Shipping Corp.; Eastgate Shipping Corp.; Lux Challenger Shipping Corp.; Lexmar Espana S.A.; E.B. Shipping Corp.; Star Chart Shipping Corp.; Mid–Atlantic Transportation Corp.; Greater South Hampton Enterprises, Ltd.; Lux Rig Co.; Lexmar Norge A/S; Lexmar France S.A.; Sea Traveler II Corp.; Lexmar Do Brazil; Lexington Construction Corp.; Lexington Hotel Corp.; Eagles Management, Inc.; Eaglehus International, Inc.; Lexington Building Systems, Inc.; 820 Riverside Drive Corp.; Lexmar Corp. (Delaware); 145 East 32nd St. Realty Corp.; 126 Greenwich Ave., Inc.; Showboat Hospitality Corp.; Valhalla Swedish Assoc.; Old Road Development Co.; Intermobil Realty and Development Corp.; Crown Estates Inc.; Smokey Hill Farm, Inc.; and Robin Hill Farm, Inc., Defendants.**

Civ. No. B–90–610 (JAC).

United States District Court, D. Connecticut.

April 3, 1991.

Madeleine F. Grossman, Alfred U. Pavlis, Westport, Conn., and William J. Honan, III, Gary D. Sesser, Judith K. Braun, Haight Gardner, Poor & Havens, New York City, for plaintiff.

Scott R. Lucas, Gary A. MacMillan, Whitman & Ransom, Greenwich, Conn., Paul A. Winick, Jacob Friedlander, Jonathan E. Polonsky, Thelen Marrin Johnson & Bridges, New York City, David R. Schaefer, Brenner Saltzman Wallman & Goldman, New Haven, Conn., Jacob D. Zeldes, Edward R. Scofield, William C. Longa, Zeldes Needle & Cooper, Bridgeport, Conn., for defendants.

1. "Time charters" or "charter parties" are contracts for the rental or "hire" of a vessel by a lessee, called a "charterer," for a specified period.

2. There are eight counts in the complaint. The first three counts allege breaches of the charter contracts for each of the three ships. Count four seeks to pierce the corporate veil; count five alleges fraud; count six charges a tortious interference with contractual relations; count seven alleges a civil conspiracy; and in count eight the plaintiff claims a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a et seq. Counts five through eight are state law claims.

## MEMORANDUM AND ORDER

THOMAS P. SMITH, United States Magistrate Judge.

■ This action arises out of the alleged anticipatory breach of three "time charter" agreements.[1] It is before the court pursuant to its admiralty and maritime jurisdiction. U.S. Const. Art. 3, sec. 2, cl. 1; 28 U.S.C. § 1333(1). The plaintiff also alleges pendent jurisdiction over various related state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1967).[2] An evidentiary hearing was held February 1, 4 and 5, 1991, on plaintiff's application for a pre-judgment remedy. Conn.Gen.Stat. § 52–279; Rule 64, F.R.Civ.P.; Rule B(1), Supplemental Rules for Certain Admiralty and Maritime Claims. The magistrate's findings of fact and conclusions of law in connection with that application follow.

### I.

The plaintiff Bergesen d.y. A/S (hereafter "Bergesen"), is a Norwegian corporation. It owns or controls a fleet of ships, including 16 very large crude carriers (hereafter "VLCCs"). Bergesen employs its vessels both on the "spot market" (i.e., on a voyage by voyage basis) and under long-term contracts.[3]

In February, 1989, Bergesen chartered to the defendant Lexmar Corporation (Liberia) (hereafter "Lexmar Liberia") three VLCCs: The BERGE LORD, the BERGE DUKE, and the BERGE SEPTIMUS for a term of five years, 30 days more or less at

3. "Long term" charters are for periods of more than 12 months. Prior to October, 1990, about 40 percent of Bergesen's tankers were covered by long term contracts. It has been Bergesen's philosophy for a number of years to commit a large percentage of its fleet to long term contracts. In the opinion of Morten Bergesen, the company's Managing Director, this policy has been at least partially responsible for enabling Bergesen to survive during the mid–1970s, a difficult period for the shipping industry when some companies went out of business.

the charterer's option. Under the three charter agreements, the total hire payments due to Bergesen were about $22 million for the first year, progressively increasing to approximately $32 million for the fifth year.[4] The three ships were delivered to Lexmar Liberia between February and May, 1989, at which point Lexmar Liberia's obligation to make monthly hire payments to Bergesen commenced.

Lexmar Corporation (Connecticut) (hereafter "Lexmar Connecticut") expressly undertook to guarantee and to remain jointly and severally liable for the obligations of Lexmar Liberia under the agreements for the charter of the BERGE LORD, the BERGE SEPTIMUS, and the BERGE DUKE. (Plaintiff's Exhibits 100, 102, 103). Each of the three charter parties contains a clause which states: "Lexmar Corporation of Greenwich, Connecticut to guarantee and remain jointly and severally responsible for the fulfillment of this Charter Party." *See* Addendum to Clause 55.

Lexmar Liberia failed to make the charter hire payment for the BERGE LORD that was due on October 15, 1990. On October 18, 1990, Bergesen sent Lexmar Liberia notice that it had not received the payment that was due on October 15. Lexmar Liberia received this notice from Bergesen on October 18, 1990.

■ Clause 7 of the charter party for the BERGE LORD provides that:

"In default of punctual and regular payment as herein specified, the owner will notify the Charterer whereupon the Charterer shall make payment of the amount due without interest *within ten (10) days of receipt of notification* from the owner, failing which the owner shall have the right to withdraw the Vessel from the service of the Charterer."

(Emphasis added). Bergesen did not receive payment from Lexmar Liberia on or before October 28, 1990. Accordingly, on Monday, October 29, 1990, Bergesen withdrew the BERGE LORD from Lexmar Liberia.[5]

During the hiatus between Lexmar Liberia's default, and Bergesen's withdrawal of the BERGE LORD, the plaintiff attempted to contact the defendant Adam Backstrom. Although Mr. Backstrom is a citizen of a foreign country, when he is in the United States, he resides at an estate maintained for him in Greenwich. He and the co-defendant Magnus Lindholm are directors of most of the defendant corporations.[6] During one of two brief phone conversations that occurred during this period, Adam Backstrom spoke with plaintiff's Managing Director, Morten Bergesen, and invited him to attend a meeting in Greenwich, Connecticut, at the offices where both Lexmar Liberia and Lexmar Connecticut maintain their principal places of business.

This meeting, which was chaired by Adam Backstrom, was held October 24 and 25, 1990. It was attended by Mr. Berges-

4. Under the three charter parties in this case the amount of the monthly hire payment for each ship is determined by multiplying the deadweight tonnage of the vessel by the rate per deadweight ton. Here, the charter party for each ship provided for a monthly rate of $2.20 per deadweight ton during the first year, $2.45 during the second year, $2.70 during the third year, $2.95 during the fourth year, and $3.20 during the fifth year. The BERGE LORD's displacement is 280,008 deadweight tons; the BERGE DUKE's is 279,518; and the BERGE SEPTIMUS's is 280,020. Thus, for the first year of the charter party, the total of the monthly hire payments for the BERGE LORD would be $2.20 × 280,008 × 12.

5. The BERGE LORD was not improperly, or prematurely, withdrawn from service. Under Clause 7 of the charter party, it was defendant Lexmar Liberia's obligation to make the hire

payment "within ten (10) days" of October 18, 1990. As of October 29, 1990, when the BERGE LORD was withdrawn, it was no longer possible for the defendant to make the hire payment "within ten (10) days" of October 18, 1990, as contemplated by the contract.

6. The corporate defendants can be divided into two groups: the shipping group and the real estate group. Unsurprisingly, the shipping defendants engage in activities in the shipping and maritime industry, while the real estate defendants own, operate, manage, or develop real estate. The plaintiff alleges in this lawsuit that the two individual defendants, Messrs. Backstrom and Lindholm, so dominate and control these various corporations that they lack individual corporate identities, and that the whole welter of corporations operates as a single enterprise to serve the personal needs of Lindholm and Backstrom.

en, Hans Dietlef Martens (Bergesen's in-house counsel), Magnus Lindholm, C.J. Geijer, G. Thorvildsen, representatives of Shell International and British Petroleum, and employees of two brokerage firms. Mr. Backstrom provided very little information during the meeting, except to tell those in attendance that Lexmar Liberia was out of money and could no longer meet its financial obligations.

During this meeting, the defendant Magnus Lindholm told Bergesen's corporate counsel, Hans Dietlef Martens, that he (Lindholm) had decided that Lexmar should get out of the shipping business. In an apparent effort to discourage litigation, Mr. Lindholm further advised Mr. Martens, in effect, that Bergesen "should not even think about trying to pierce the corporate veil."

■ As a result of the meeting, Bergesen reasonably concluded that no further hire payments would be forthcoming. Thus, when Bergesen did not receive a hire payment for the BERGE LORD on or before October 28, 1990, it withdrew the BERGE LORD from the charter on October 29, 1990.[7]

Lexmar Liberia also failed to make the November 1, 1990, hire payment that was due on the BERGE SEPTIMUS. Accordingly, Bergesen provided notice of default, and ultimately withdrew the BERGE SEPTIMUS from the charter on November 13, 1990. Similarly, when no payment was made for the BERGE DUKE by November 5, 1990, notice of default was given, and that ship was withdrawn from charter to Lexmar Liberia on November 19, 1990.

■ Clause 52 of the charter parties is a choice of law clause. In pertinent part, it states that in the event of a dispute, the law of the "United States/England" will apply. The undersigned finds that, despite the signatories' inexplicable failure to cross out the name of the country whose law was *not* intended to apply, it was their intention that the law of England would govern the charter agreements.

The foregoing conclusion is based partially on Mr. Morten Bergesen's credible testimony that it is Bergesen's policy to select English law.[8] In addition, in Clause 55 of each agreement, it is apparent that the parties signified their choice of London over New York City as the situs for arbitration of any disputes arising out of the agreement.[9] Finally, the selection of Lexmar Liberia as the charterer, with Lexmar (U.K.) as the managing agent, also lends some support to the conclusion that the parties' intended preference, though imperfectly expressed, was for the law of England to govern.

■ The world oil market affects the market for VLCC charters. VLCC charters may be either "time charters" or "voy-

7. Even if Clause 7 of the charter party could be interpreted to allow Lexmar Liberia to make its payment on Monday, October 29, 1990, on the theory that plaintiff's New York bank was closed Sunday, October 28, 1990, there is no evidence that any defendant desired to make a payment at any time after it came due on October 15, 1990. The failure of any defendant to attempt to make payment within the period contemplated by Clause 7, or even to express a desire to do so, coupled with the ominous pronouncements of Adam Backstrom and Magnus Lindholm at the October 24 and 25 meetings in Greenwich, underscores the reasonableness of plaintiff Bergesen's withdrawing the vessel from the charter on October 29, 1990.

8. The magistrate disagrees with defendants' characterization of this action as an attempt by plaintiff to acquire through contract reformation benefits which it neglected to bargain for in the first instance. The magistrate rejects defen-dants' suggestion that the Bergesen ships were defective in any material way. The magistrate also rejects the suggestion that the availability of a prejudgment remedy depends on whether the plaintiff is able to untie the corporate Gordian Knot which the defendants have created. Similarly, the magistrate declines otherwise to impose on the plaintiff at this early stage of the proceedings a burden of proof that it need not bear until trial.

9. Restatement (Second) of Conflict of Laws § 218 (comment b) notes that the parties' selection of a location for arbitration may evidence an intention that the law of this same location govern the contract as a whole. The Supreme Court also has recognized this principle. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 n. 13, 94 S.Ct. 2449, 2457 n. 13, 41 L.Ed.2d 270 (1974). *Also see, Splosna Plovba of Piran v. Agrelak Steamship Corp.*, 381 F.Supp. 1368, 1370 (S.D.N.Y.1974) (Knapp, J.).

age charters." The former are charters for a specified period, while the latter are for the duration of a particular voyage. "Voyage charters" are obtained on the "spot market". The current market for long-term VLCC charters has fallen below the contract price specified in the charters at issue here. Since the termination of the charters, Bergesen has been unable to obtain long-term charters for the vessels.

Morten Bergesen and Halvor Kielland have provided expert testimony regarding the VLCC long-term charter market. It was the opinion of both that, despite the market's being subject to myriad factors, one could nonetheless predict with a reasonable degree of certainty what the market would be like over the balance of the life of the charter contracts at issue here.

According to Mr. Bergesen, the market rate for equivalent VLCC time charters will be $22,000 per day, while it was Kielland's opinion that the daily rate would be $21,000 over the balance of the life of the contracts here. The charter agreements in this case provide for an average daily rate of approximately $27,500 per ship. Using a daily rate of $21,500 (mid-way between Kielland's and Bergesen's respective opinions), over the life of the three charter agreements in this case, Bergesen will sustain $19,679,138 in contract damages. The defendants have offered no evidence to the contrary.

The defendants did, however, develop on cross examination that, except for pre-withdrawal hire payments,[10] thus far, Bergesen has not actually sustained any damages, since it has been able to mitigate its losses by chartering the three vessels on the spot market. In recent months, the spot market has risen due to Iraq's invasion of Kuwait and the Persian Gulf war. It was the expert opinion of both Messrs. Kielland and Bergesen, however, that the spot market would drop dramatically—along with plaintiff's ability to mitigate—when hostilities in the Persian Gulf finally end. At that point, the plaintiff will begin to sustain

real losses, since it will no longer be able to mitigate on the spot market. The defendants have offered no evidence to the contrary on this point either.

■ Defendants are correct that no one can be sure when hostilities in the Persian Gulf will have subsided to the point that mitigation on the spot market is no longer possible. They are also correct that, by the testimony of plaintiff's very own expert witnesses, the world oil market, and that for VLCCs, is affected by a multitude of factors, and is highly volatile. But these things do not make it impossible to predict with a reasonable degree of certainty what the VLCC market will be over the balance of the contracts in this case. Rather, they are factors that make prediction difficult, that should be considered carefully in evaluating the weight to be given to an expert opinion, and that counsel due caution before one accepts an opinion.

Taking into account all of the points made by counsel for the defense during cross-examination of plaintiff's experts, and considering as well the arguments in defendants' opposing papers, (including the post-hearing submissions by the February 20, 1992, letter of Gary A. MacMillan, Esquire, pertaining to Mr. Kielland's alleged relationship with the plaintiff's witness, Morten Kristiansen), the magistrate nevertheless concludes that plaintiff's expert witnesses are credible, and that their expert testimony with respect to market rate for the life of the charters at issue here is trustworthy, reliable, and accurate for present purposes.

■ The underpinnings of Bergesen's contract claims directly against Lexmar Liberia and Lexmar Connecticut are clear-cut and uncomplicated. On these claims alone, the plaintiff may be entitled to over $20 million in damages. The chief basis of Bergesen's extra-contractual claims is that the defendants Backstrom and Lindholm have deliberately and tortiously choreographed the movement of assets from Lexmar Liberia and Lexmar Connecticut to

---

**10.** Plaintiff's papers reflect that the defendants owe $914,128 for charter hire incurred prior to Bergesen's withdrawal of the vessels from the charters. *See* Plaintiff's Proposed Finding of Fact 74.

"the real estate defendants," so as to render the former two corporations unable to pay their debts.[11] Bergesen further maintains that the corporate defendants in this case are little more than shadows of Backstrom and Lindholm. Bergesen's extracontractual claims expose the defendants to the possibility of punitive damages.

There are thirty-six (36) corporate defendants in this case. These corporations are either "shipping defendants" or "real estate defendants". *See* Note 6, *supra.* Through stock ownership and positions on their boards of directors, Messrs. Backstrom and Lindholm effectively control and dominate all of them.[12] All of the corporations operate out of a single office suite in Greenwich. Their functions are not separated within that office, and a common staff is shared by the real estate corporations and the shipping corporations.

Until March, 1990, Seth Weinstein acted as the chief financial officer and treasurer of all of the real estate and the shipping corporations. In that capacity, Weinstein frequently prepared consolidated cash flow analyses showing the financial picture of the shipping corporations in relation to the real estate corporations. This was done to facilitate "loans" from corporations which had cash to those that needed it. Such "loans" were made on an "as needed" basis, and were often casually reported on "inter office memos." The shipping corporations also shared a common bank account in which their deposits were commingled. Furthermore, financial statements were prepared to reflect the performance of all of the shipping corporations on one consolidated document.

Over $52 million was transferred from the shipping defendants to the real estate group from the late 1980s to October, 1990. During the one year period between May, 1989, and May, 1990, alone, over $24 million was taken from the shipping defendants and put into the coffers of the real estate defendants. For example, as of May 31, 1990, the defendant Lexington Development Group, Inc., ("LDG") had received over $22.8 million; the defendant Robin Hill Farm Inc., ("Robin Hill") over $5.7 million; and the defendant Intermobil Realty and Development Corp., ("Intermobil") over $10.6 million. It is clear that the individual defendants derived enormous personal benefits as a likely result of this filtration process.[13]

**11.** In an effort to parry plaintiff's thrust, the defendants point to various financial records to establish that Lexmar Liberia and Lexmar Connecticut were not profitable and, rather than being suppliers of funds, were actually the *recipients* of huge loans from Starlux. Therefore, the defendants' argument runs, any funds which Starlux may have loaned to the real estate defendants did not *originate* with Lexmar Liberia or its guarantor, Lexmar Connecticut.

On this record, however, the magistrate finds defendants' argument, and the evidence on which it is based, unpersuasive. The magistrate instead credits the testimony of Morten Kristiansen that, though profits were cyclical, Lexmar Liberia was profitable. The magistrate further finds, in part from the testimony of William Miller, the Controller of Lexmar Connecticut (and possibly several other defendant corporations), that financial information pertaining to one corporation (*i.e.,* Lexmar Liberia) was sometimes recorded in the books of another corporation (*i.e.,* Lexmar Connecticut) in the name of yet a third corporation (*i.e.,* Star Chart Shipping). This testimony, together with that of Seth Weinstein regarding the corporations' loan practices, and the dubious circumstances surrounding the placing of fifteen mortgages on the defendants' real estate in November, 1990, leaves the magistrate highly skeptical of defendants' self-serving financial analysis and their records.

**12.** The defendant Atlantic Brands Corp. ("Atlantic Brands") is the holding company of the shipping defendants. Atlantic Brands owns the defendant Starlux Corp. ("Starlux"). Starlux, in turn, owns most of the individual shipping corporations, including Lexmar Liberia. The Directors of Atlantic Brands are Adam Backstrom, Magnus Lindholm, and Seth Weinstein. Mr. Lindholm is also the President of Atlantic Brands, while Mr. Backstrom is its Vice President and Secretary. Lindholm owns 50% of Atlantic Brands' shares. Backstrom and his family own the other 50% directly or in trust. Backstrom and Lindholm control and dominate the Boards of Directors of Atlantic Brands, Starlux, and Lexmar Liberia.

**13.** Adam Backstrom is the chairman of LDG, which is owned by a Luxembourg corporation which, in turn, is owned by Lindholm and Backstrom. Mr. Lindholm is the beneficial owner of Robin Hill, whose shares are held by Seth Weinstein as Lindholm's nominee. Robin Hill's primary asset is the Lindholm residence, a palatial estate in Greenwich, where until January, 1991,

Although these transfers were characterized on the books of the defendant Starlux as "loans", until the proverbial eve of this lawsuit, they were unsecured and never memorialized in any loan agreement. Moreover, interest was not even paid to Starlux, but was allowed to "accrue" on the borrower's books.

Morten Kristiansen, the President of Lexmar Liberia [14] from September, 1989, until October 16, 1990, and other executives in the shipping group complained to Messrs. Backstrom and Lindholm about shipping funds being diverted to the real estate corporations, specifically warning them that the "loans" would make it difficult for the shipping defendants to meet their obligations to creditors during the second half of 1990. Nevertheless, the diversion of funds to the real estate group continued almost on a weekly basis through mid-October, 1990.

On November 15, 1990, roughly two weeks before Bergesen filed its complaint in this case, fifteen separate mortgages—totalling over $30 million and dated the previous day—were recorded on the defendants' properties in Greenwich. These mortgages were given to defendant Atlantic Brands, defendant Magnus Lindholm, defendant Intermobil, defendant Robin Hill, Frederick Roos, Brent Ahlstrom, and Jan Nordlinger. The mortgage to Atlantic Brands alone is for over $15 million.

█ In response to subpoenas by Bergesen's counsel, the defendants produced, and were cross-examined concerning, the documents which allegedly support the fifteen mortgages. Without belaboring the point, the magistrate finds that those documents lack the basic indicia of trustworthiness and solemnity that a reasonable person normally would expect of legitimate records relating to transactions involving such large sums. The documents include, for example, copies of wire transfers from numbered Swiss accounts; undated corporate dividend resolutions; undated promissory notes; and, in one instance, a single page invoice purportedly evidencing a debt for carpentry work and renovations in the amount of roughly $4 million. The irregularity of these documents is yet another circumstance tending to bolster Bergesen's argument that the mortgages are gratuitous, and should be viewed as a gossamer attempt by the defendants to place yet another obstacle in plaintiff's way.

## II.

This matter originally was referred to the magistrate to conduct a hearing and to prepare a recommended ruling on plaintiff's motion for a prejudgment remedy. Thereafter, however, the parties consented to the magistrate's actually deciding the motion, with the parties reserving their right to Article III review by way of appeal to The Honorable Jose A. Cabranes, U.S. District Judge. Judge Cabranes has approved of the motion's being decided on this basis and, accordingly, has expanded the scope of the original reference.[15]

## III.

Plaintiff Bergesen seeks a writ attaching the defendants' property. Both Rule 64, F.R.Civ.P., and Rule B(1), Supplemental Rules for Certain Admiralty and Maritime Claims, make Connecticut's pre-judgment remedy statutes applicable in this case. Under Connecticut law, "[a]ttachments may be granted upon all complaints containing a money demand against the estate of the defendant, both real and personal." Conn.Gen.Stat. § 52–279. In passing upon an application for a prejudgment remedy,

Lindholm and his family lived rent free. Intermobil's major asset is yet another large estate in Greenwich, which is the residence that Backstrom and his family occupy rent free.

**14.** Morten Kristiansen was recruited by Adam Backstrom. During the recruitment, Backstrom referred to his shipping operation as if it were a single entity, and hired Kristiansen as the president of the entire group. During Kristiansen's tenure, all of the shipping companies were operated and managed as a single entity which they referred to internally and publicly as the "Lexmar Group."

**15.** *See* 28 U.S.C. § 636(c)(4). On the standard of review of decisions made under this section, *see, e.g., Jones v. Judy,* 741 F.Supp. 1293, 1294 (N.D.Ohio 1990).

the court must determine whether there is "probable cause to sustain the validity of the plaintiff's claim." Conn.Gen.Stat. § 52–278d(a); *also see* § 52–278c(a)(2) ("probable cause that judgment will be rendered in the matter in favor of the plaintiff.").

As the Connecticut Supreme Court recently observed in *New England Land Co., Ltd. v. DeMarkey,* 213 Conn. 612, 569 A.2d 1098 (1990):

> " 'The legal idea of probable cause is a *bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.' *Wall v. Toomey,* 52 Conn. 35, 36 (1884). Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated by a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. *Ledgebrook Condominium Assn., Inc. v. Lusk Corporation,* 172 Conn. 577, 584, 376 A.2d 60 (1977). The court's role in such a hearing is to determine probable success by weighing probabilities. *Michael Papa Associates v. Julian,* 178 Conn. 446, 447, 423 A.2d 105 (1979). *Three S. Development Co. v. Santore,* 193 Conn. 174, 175–76, 474 A.2d 795 (1984); *see also Babiarz v. Hartford Special, Inc.,* 2 Conn.App. 388, 393, 480 A.2d 561 (1984)." *Solomon v. Aberman,* 196 Conn. 359, 362–63, 493 A.2d 193 (1985).

*Id.* 213 Conn. at 620, 569 A.2d 1098. Moreover, as defendants correctly note, the court has "broad discretion to 'weigh the probabilities'...." (Defendants' Joint Memorandum at 26). *Also see Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 429, 378 A.2d 538 (1977).

 Based on the credible testimony and other evidence adduced at the three day hearing, the magistrate finds that the plaintiff Bergesen has established probable cause to sustain the validity of its claims. The magistrate further concludes that the Connecticut prejudgment remedy statutes have not been shown to be unconstitutional either facially or as applied.[16] To the contrary, given the apparent interrelationship among them, the magistrate finds that each defendant, whether personally served with process or not, *see e.g.,* note 10, *supra,* has had adequate pre-deprivation notice and a meaningful opportunity to be heard. The defendants have simply chosen for now not to avail themselves fully of that opportunity.

 To the extent defendants assert that the "probable cause" standard itself is insufficiently rigorous to provide a constitutionally adequate level of protection to their property interests, the magistrate also disagrees. The potential hardship to the defendants in this case from the issuance of a writ of attachment is really no greater than that experienced by one whose privacy or liberty interests are af-

---

**16.** The existence of a protectible property interest triggers due process guarantees. *Cf. Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Though the exact process that is due may vary, *Hannah v. Larche,* 363 U.S. 420, 440, 80 S.Ct. 1502, 1513, 4 L.Ed.2d 1307 (1960), it must involve " 'an opportunity ... granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case." *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). In addition, at various times the Supreme Court has identified the following things as elements of due process:

> "(1) notice of the basis of the governmental actions; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of the reasons for the result."

*Rogin v. Bensalem Township,* 616 F.2d 680, 694 (3d Cir.1980). The defendants do not appear to claim that any of the foregoing seven elements is unavailable to them here.

fected by the execution of a search or arrest warrant. Certainly, it is neither irrational nor arbitrary for the state legislature to have concluded that the time honored "probable cause" standard supplies protection enough for the constitutional interests that are implicated here.

While it is understandable that defendants advocate creating a hierarchy of rights in which their property interests dwell on a higher plane, there is no reason to accord them a greater degree of protection than is customarily afforded to liberty and privacy interests. Moreover, the Second Circuit has recognized that even an individual's *home*—property that "merits special constitutional protection"—is adequately protected by the probable cause standard. *E.g., U.S. v. Property at 4492 S. Livonia Rd., Livonia*, 889 F.2d 1258, 1264, 1267 (2d Cir.1989). Surely defendants do not suggest that the federal constitution demands more from the state legislature than it does from Congress. Defendants' reliance on cases involving no notice, or only *post*-deprivation notice, of course, is clearly misplaced in the circumstances before the court.

■ On this record at least, the evidence indicates rather clearly that it was the defendants who repudiated the three charter parties. That repudiation constituted an anticipatory breach of the three contracts. Anticipatory breaches have long been actionable under both American and English law. *See, e.g., Roehm v. Horst*, 178 U.S. 1, 20, 20 S.Ct. 780, 787, 44 L.Ed. 953 (1900); *Allegheny Valley Brick Co. v. C.W. Raymond Co.*, 219 F. 477, 482 (2d Cir.1914); *Commercial Metals Co. v. International Union Marine Corp.*, 294 F.Supp. 570, 574 (S.D.N.Y.1968); *O'Hare v. General Marine Transport Corp.*, 564 F.Supp. 1064, 1068–69 (S.D.N.Y.1983), *aff'd.*, 740 F.2d 160 (2d Cir.1984), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985); 11 Williston, *Contracts* § 1301 (1968).

■ This record also contains ample credible evidence that defendants' breach is reasonably likely to result in approximately $20 million contract damages to the plaintiff over the balance of the three charter parties. While it is true that plaintiff is unable to prove its damages with exactitude, the degree of specificity that the defendants would have the court demand is unnecessary. *See, e.g., United Transp. Co. v. Berwind–White Coal Mining Co.*, 13 F.2d 282, 284 (2d Cir.1926) ("absolute certainty" not required). As one court has observed:

> By its nature, an assessment of future damages will always involve some uncertainty.... [D]efendant will not be heard to complain of uncertainty when that uncertainty has been caused by its own acts. *See, e.g., Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1169 (S.D.N.Y.1983) (Weinfeld, J.) ("the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

*Buckley v. Reynolds Metal Company*, 690 F.Supp. 211, 216 (S.D.N.Y.1988). All that is required for present purposes is "evidence yielding a fair and reasonable estimate" of damages. *Burkert v. Petrol Plus of Naugatuck, Inc.*, 5 Conn.App. 296, 301, 497 A.2d 1027 (1985). The plaintiff's evidence clearly meets this standard.

Parenthetically, the magistrate also notes that the defendants have offered no evidence establishing that Bergesen could reduce its contract damages further through mitigation greater than that which Bergesen's projections contemplate. *E.g., Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 308 n. 9 (2d Cir. 1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988) (burden of proving *failure* to mitigate).

■ Turning to the issue of "piercing the corporate veil", it is undisputed that the court has the power to determine whether there is an alter ego behind a corporation. *Swift & Co. v. Compania Colombiana Del. Caribe, S.A.*, 339 U.S. 684, 689 n. 4, 70 S.Ct. 861, 865 n. 4, 94 L.Ed. 1206 (1950). In deciding whether to pierce the corporate veil in a case such as this one, the court applies federal common law, importing into its decision those principles of state law which it finds both persuasive and appropriate to subsume. *Sa-*

*bine Towing & Transp. Co. v. Merit Ventures, Inc.*, 575 F.Supp. 1442, 1446 (E.D. Tex.1983). This court, therefore, has considerably more flexibility in dealing with state law precedents than if this were purely a diversity case, such as *Owens v. American Nat. Red Cross*, 673 F.Supp. 1156, 1162–63 (D.Conn.1987) (Cabranes, J.). *Also see, generally,* C. Wright, *Law of Federal Courts* § 60 at 396 (1983).

The Supreme Court has "consistently interpreted the grant of general admiralty jurisdiction to the federal courts as a proper basis for the development of judge-made rules of maritime law." *Law of Federal Courts, supra* § 60 at 391. As a result, a significant amount of admiralty law is federal common law. *Edmonds v. Compagnie Generale Transatl.,* 443 U.S. 256, 259, 99 S.Ct. 2753, 2755, 61 L.Ed.2d 521 (1979). One such decision is *Sabine Towing, supra.* In that case, the court stated:

> "A trial court should pierce the corporate veil and require a parent corporation to answer for the debts of a subsidiary when the subsidiary conducts business in a manner that clearly indicates that the parent is an alter ego of the subsidiary.... To find an alter ego relationship, the evidence must disclose a pattern of control or domination of a corporation by an individual or corporation, and that this domination was used to support a corporate fiction.... Once that is established, it will be appropriate to disregard a corporate entity when it appears a corporation was organized for fraudulent or illegal purposes. Furthermore, it is quite clear that the veil should be pierced when it will prevent manifest injustice to third parties."

575 F.Supp. at 1446 [citations omitted].

After noting that each case is *sui generis,* and that there is "no set formula" that governs whether the corporate veil should be pierced in a particular case, *id.,* the court observed that there are at least fifteen factors whose presence, either alone or in combination, may militate in favor of piercing the corporate veil. Those fifteen factors are: (1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent; (6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties. *Id.* at 1446–48.

Connecticut law also permits the corporate veil to be pierced where justice requires. *E.g., Zaist v. Olson,* 154 Conn. 563, 227 A.2d 552 (1967). " 'The circumstances which have been considered significant in an action to disregard the corporate entity have rarely been articulated with any clarity. Perhaps this is true because the circumstances necessarily vary according to the facts of the particular case.' " *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.,* 187 Conn. 544, 556 n. 7, 447 A.2d 406 (1982), quoting 1 Fletcher, *Cyclopedia Corporations* § 41.3 (1981). State law is clear, however, that one seeking to pierce the corporate veil must demonstrate applicability of the "instrumentality rule" or the "identity rule". *Zaist, supra,* 154 Conn. at 575, 227 A.2d 552; *Saphir v. Neustadt,* 177 Conn. 191, 210, 413 A.2d 843 (1979).

The "instrumentality rule" requires:

> "proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or

wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control must proximately cause the injury or unjust loss complained of."

*Id.* at 210, 413 A.2d 843, quoting *Zaist, supra.*

Under the "identity rule", on the other hand, one who seeks to pierce the corporate veil must show:

"there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation for the benefit of the whole enterprise."

*Zaist, supra,* 154 Conn. at 576, 227 A.2d 552.

While state law is not entirely clear on the point, at least one Connecticut federal court sitting in diversity has squarely determined that a showing of "actual fraud" is not required under either rule. *See International Union, etc. v. Bristol Brass Co.,* Civil No. H–87–980, (D.Conn. July 18, 1988) *slip op.* at 8 (Dorsey, J.). In that case, the court noted that "since the doctrine of disregarding the corporate entity is equitable in nature ..., it may also be applied when equity requires, even if no actual fraud is proven." *Id.,* citing *Angelo Tomasso, Inc., supra,* 187 Conn. at 555, 447 A.2d 406. *Also see Connecticut Co. v. New York, N.H. & H.R.R.,* 94 Conn. 13, 27, 107 A. 646 (1919) (veil pierced where "the interests of justice and righteous dealing so demand."); *Brunswick Corp. v. Waxman,* 599 F.2d 34, 36 (2d Cir.1979) (equitable considerations paramount). As *Bristol Brass* points out, the *Connecticut Company* decision was cited with approval in *Zaist, supra,* 154 Conn. at 574, 227 A.2d 552, and is, therefore, still the law in Connecticut.

█ Applied to the facts here, any one of the three foregoing "tests" suggests that it is appropriate to pierce the corpo-

rate veil. Turning first to *Sabine Towing,* it appears that most of the criteria which it identifies clearly have been met. There is overlapping ownership of most, if not all, of the corporate defendants; there are common officers and directors; and the defendants operate out of the same location in Greenwich on a largely informal basis. Lexmar Liberia appears to have been kept financially subservient; its parent is merely a holding company; and its interests appear to have been subordinated to those of other corporate defendants through decision-making which seems neither independent, nor in the subsidiary's best interests. There are "loan" agreements which are unduly favorable to dominant corporate borrowers (*e.g.,* unsecured loans where interest is not actually paid to the "lender", but allowed to "accrue" on the borrower's books). While it is unclear at this point what kind of tax returns have been filed, the evidence shows that consolidated financial statements and accounting records were prepared for "shipping companies" and for "real estate companies". Without reiterating in detail earlier findings, the evidence adduced thus far also points to complete control of all of the corporate defendants by Magnus Lindholm and Adam Backstrom. Finally, on the instant record, it appears that denial of the relief requested by Bergesen could well work an irremediable injustice.

Focusing on Connecticut law as a helpful guide for formulating federal common law, the result is the same. With regard to the "instrumentality rule," it appears that Messrs. Backstrom and Lindholm's domination of all of the corporate defendants is sufficiently complete and pervasive that no corporation presently should be viewed as having had an independent "mind" or "will" with respect to any significant transaction. Moreover, their control appears to have been purposefully exercised so as to deprive the plaintiff of any economic incentive to enforce its contract rights, thus unfairly rendering those rights illusory for all practical purposes. *Campisano v. Nardi,* 212 Conn. 282, 293, 562 A.2d 1 (1989) (Peters, C.J.); *Brunswick Corp. v. Wax-*

*man, supra.* Finally, the injuries of which the plaintiff complains seem to be the proximate result of an exercise of that control over Lexmar Liberia, Lexmar Connecticut, and the other corporate defendants.

The plaintiff fares just as well if the "identity rule" is used as a compass, for the evidence fairly suggests that the seemingly separate and independent corporate defendants which have been sued here are, in reality, interdependent components of a single, far-flung and deliberately convoluted enterprise that is personally controlled by Adam Backstrom and Magnus Lindholm. According to the dictates of their will or convenience, it appears that one corporation's income may be recorded on the books of another corporation in the name of yet a third corporation; the liabilities of one subsidiary may be imposed on an entirely different one; corporate assets are commingled and diffused, while cash freely and informally flows from one corporation to another; and enormous benefits inappropriately accrue to Messrs. Backstrom and Lindholm personally. Furthermore, to adhere to the fiction of separate corporate identities in these circumstances would unjustly allow the individual defendants, and their labyrinthine enterprise, to escape from a liability that has arisen out of an activity that was conducted for their benefit. *Zaist, supra,* 154 Conn. at 576, 227 A.2d 552, *citing Mull v. Colt Co.,* 31 F.R.D. 154 (S.D.N.Y.1962).

Plaintiff's application for a prejudgment remedy is granted, the undersigned finding that there is probable cause to attach the defendants' property in the amount of $21 million. Plaintiff's counsel shall submit a proposed writ, or writs, to the undersigned forthwith. To the extent that establishing an expedited discovery schedule and setting the earliest possible trial date may minimize the hardship defendants profess may result from the issuance of writs of attachment, the defendants are free to so move. Counsel also are urged to explore the possibility of posting a bond. The parties, of course, have the right to timely

seek Article III review [17] and are advised that the failure to do so may preclude any further appeal. *See* 28 U.S.C. § 636; Rule 72, F.R.Civ.P.; Local Rules for U.S. Magistrate Judges.

---

**17.** This opinion is divided into sections for reasons of convenience only. The magistrate's findings of fact are contained in the text and footnotes throughout.